# Exhibit 3
# to Supplemental Declaration of Alanna B. Carbis in Support of Reply Memorandum of Law in Support of Petition to Enforce Civil Investigative Demand and Request for Judicial Notice

EXHIBIT 3
95

CARMEN L. CHRISTOPHER, CA Bar #231508
Email: carmen.christopher@cfpb.gov
Telephone: (312) 610-8961
ANTHONY ALEXIS, DC Bar #384545
Email: anthony.alexis@cfpb.gov
Telephone: (202) 435-7999
JEFFREY PAUL EHRLICH, FL Bar #51561
Email: jeff.ehrlich@cfpb.gov
Telephone: (202) 435-7598
JOHN C. WELLS, DC Bar #491292
Email: john.wells@cfpb.gov
Telephone: (202) 435-9319
THOMAS G. WARD, IL Bar #6291011
Email: thomas.ward@cfpb.gov
Telephone: (312) 610-8966
MAXWELL S. PELTZ, CA Bar #183662
Email: maxwell.peltz@cfpb.gov
Telephone: (415) 633-1328
        Local Counsel for Thomas G. Ward
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Facsimile: (312) 610-8971


Attorneys for Plaintiff
Consumer Financial Protection Bureau


AMY MCFARLANE, CA Bar #229214
Email:  Amy.McFarlane@ag.ny.gov
Telephone: (212) 416-6195
Office of the New York State Attorney General
120 Broadway
New York, NY 10271-0332
Facsimile: (212) 416- 6015


Attorney for Plaintiff
Acting Superintendent of Financial Services
of the State of New York

1

EXHIBIT 3
96

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**SOUTHERN DIVISION**

Consumer Financial Protection Bureau
and Anthony J. Albanese, Acting
Superintendent of Financial Services of
the State of New York,

                    Plaintiffs,

                v.

Pension Funding, LLC; Pension Income,
LLC; Steven Covey; Edwin Lichtig; and
Rex Hofelter,

                Defendants.

**Case No. 8:15-cv-1329**

**COMPLAINT FOR VIOLATIONS OF
THE CONSUMER FINANCIAL
PROTECTION ACT AND NEW YORK
BANKING AND FINANCIAL SERVICES
LAWS**

      The Consumer Financial Protection Bureau (Bureau) and Anthony J.
Albanese, Acting Superintendent of Financial Services of the State of New York
(Superintendent), bring this action against Pension Funding, LLC (Pension
Funding), Pension Income, LLC (Pension Income), Steven Covey, Edwin Lichtig,
and Rex Hofelter under the Consumer Financial Protection Act of 2010 (CFPA),
12 U.S.C. §§ 5552(a)(1), 5531, 5536(a), 5564, and 5565, and the laws of New
York State, and allege as follows:

**Introduction**

      1.    Defendants Steven Covey, Edwin Lichtig, and Rex Hofelter, through
their companies, Pension Funding and Pension Income, offered consumers
"pension advances"—lump-sum payments that consumers could receive in return
for agreeing to redirect all or part of their pension payments, over eight years, to
repay the funds.

2

EXHIBIT 3
97

2.      Defendants represented to consumers, among other things, that these advances were not "loans," that there was no applicable interest rate or that any effective interest rate was substantially below the cost of other sources of cash, such as credit cards or home equity lines of credit, and that there were no applicable fees.

3.      In fact, Defendants' product was a loan, and the effective interest rate was greater than those typically available for other products to which Defendants drew comparisons. Defendants thus misrepresented aspects of the product they offered and took advantage of consumers' lack of understanding of Defendants' product and potential alternatives.

4.      Plaintiffs bring this suit to secure injunctive relief, other monetary and equitable relief, and civil money penalties.

**Jurisdiction and Venue**

5.      This Court has subject-matter jurisdiction over this action because it is brought under "Federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345, and by a state regulator, 28 U.S.C. § 5552(a)(1).

6.      Under 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the Superintendent's claims because they are so related to the Bureau's claims that they form part of the same case or controversy and because those claims arise out of the same transactions or occurrences as the Bureau's action under the CFPA, 12 U.S.C. § 5301 *et seq.*

7.      Venue is proper because Defendants transact business in this district and three of the Defendants reside in this district. 28 U.S.C. § 1391(b), (c); 12 U.S.C. § 5564(f).

3

EXHIBIT 3
98

**Parties**

8.     The Bureau is an independent agency of the United States charged with regulating the offering and providing of consumer financial products and services under "Federal consumer financial laws." 12 U.S.C. § 5491(a). The Bureau is authorized to initiate civil actions in federal district court, by its own attorneys, to address violations of "Federal consumer financial law." 12 U.S.C. § 5564(a)-(b).

9.     The Superintendent is the chief executive of the New York State Department of Financial Services, an agency of the State of New York charged with the enforcement of banking, insurance, and financial services laws, and the protection of consumers and markets from fraud. N.Y. Fin. Servs. Law §§ 102, 202, 301(c)(1). The Superintendent, as a state regulator, is authorized to initiate civil actions in federal district court against any entity that is under his supervision and subject to licensing and regulation requirements pursuant to the banking and financial services laws or that is authorized to do business under state law to address violations of the CFPA. N.Y. Fin. Servs. Law § 104(2), 104(4), 309; 12 U.S.C. § 5552(a)(1).

10.     Pension Funding is a California limited liability company with its principal place of business at 7777 Center Ave., Huntington Beach, CA 92647. At all material times, Pension Funding transacted business in this district and nationwide, including in the State of New York, extending consumer credit, servicing consumer loans, and transmitting money in connection with its loan business or in connection with those loans. Pension Funding is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(6), (15)(A)(i). Pension Funding is also a "regulated person"—a person or entity that should be licensed— under the New York Financial Services Law. N.Y Fin. Servs. Law § 104(4).

4

EXHIBIT 3

99

11.     Pension Income is a California limited liability company. Its principal place of business was at 7777 Center Ave., Huntington Beach, CA 92647, until it recently relocated to 3527 Mt Diablo Boulevard, Lafayette, CA 94549. At all material times, Pension Income transacted business in this district and nationwide, including the State of New York, extending consumer credit, servicing consumer loans, and transmitting money in connection with its loan business or in connection with those loans. Pension Income is therefore a "covered person" under the CFPA. 12 U.S.C. § 5481(6), (15)(A)(i). Pension Income is also a "regulated person"—a person or entity that should be regulated—under the New York Financial Services Law. N.Y Fin. Servs. Law § 104(4).

12.     Steven Covey is or was a manager of Pension Funding and Pension Income. Covey participated in designing, marketing, selling, and servicing the extensions of credit and loans at issue, as well as authorizing, facilitating, and conducting the transmittal of money. At all material times, Covey managed, directed, controlled, or had the authority to control and materially participated in the conduct of the affairs of Pension Funding and Pension Income. Covey is therefore a "related person" to both Pension Funding and Pension Income under the CFPA. 12 U.S.C. § 5481(25)(C)(i)-(ii). Because Covey is a "related person," he is deemed a "covered person" for purposes of the CFPA. 12 U.S.C. § 5481(25)(B). Covey is also a "regulated person" under the New York Financial Services Law. N.Y. Fin. Servs. Law § 104(4). Covey resides in this district and, in connection with the matters alleged, transacted business here.

13.     Edwin Lichtig is the managing member of Pension Income and is or was a manager of Pension Funding. Lichtig participated in designing, marketing, selling, and servicing the extensions of credit and loans at issue, as well as authorizing, facilitating, and conducting the transmittal of money. At all material times, Lichtig managed, directed, controlled, or had the authority to control and

1    materially participated in the conduct of the affairs of Pension Funding and

2    Pension Income. Lichtig is therefore a "related person" to Pension Funding and

3    Pension Income under the CFPA. 12 U.S.C. § 5481(25)(C)(i)-(ii). Because Lichtig

4    is a "related person," he is deemed a "covered person" for purposes of the CFPA.

5    12 U.S.C. § 5481(25)(B). Lichtig is also a "regulated person" under the New York

6    Financial Services Law. N.Y. Fin. Servs. Law § 104(4). In connection with the

7    matters alleged, Lichtig transacted business in this district.

8         14.    Rex Hofelter is the managing member of Pension Funding and is or

9    was a manager of Pension Income. Hofelter participated in designing, marketing,

10   selling, and servicing the extensions of credit and loans at issue, as well as

11   authorizing, facilitating, and conducting the transmittal of money. At all material

12   times, Hofelter managed, directed, controlled, or had the authority to control and

13   materially participated in the conduct of the affairs of Pension Funding and

14   Pension Income. Hofelter is therefore a "related person" to Pension Funding and

15   Pension Income under the CFPA. 12 U.S.C. § 5481(25)(C)(i)-(ii). Because

16   Hofelter is a "related person," he is deemed a "covered person" for purposes of the

17   CFPA. 12 U.S.C. § 5481(25)(B). Hofelter is also a "regulated person" under the

18   New York Financial Services Law. N.Y. Fin. Servs. Law § 104(4). Hofelter resides

19   in this district and, in connection with the matters alleged, transacted business in

20   this district.

21        15.    Defendants Pension Funding and Pension Income (collectively, PF-

22   PI) operate or operated as a common enterprise while engaging in the unlawful acts

23   and practices alleged in the Complaint. PF-PI conducted the business practices

24   described below as interrelated companies that have or had common ownership,

25   officers, managers, employees, office locations, and mailing addresses. Because

26   these Defendants have operated as a common enterprise, each of them is jointly

27   and severally liable for the acts and practices alleged below. Individual Defendants

28

6

EXHIBIT 3

Covey, Lichtig, and Hofelter directed, controlled, had the authority to control, or materially participated in the acts and practices of the corporate Defendants that comprise the common enterprise.

### Factual Background

16.     Describing its products as "tailored financing programs," PF-PI purported to purchase, through lump-sum payments, eight years of "future cash flow" from consumers' pension payments.

17.     From 2011 until about December 2014, PF-PI marketed and offered its product to consumers with pensions from sources such as military and civil service. PF-PI continues to service the transactions.

**A.     PF-PI marketed its product to military veterans and other pensioners.**

18.     PF-PI paid to steer internet-search traffic to its website using Google AdWords. It targeted consumers who conducted Google searches for phrases such as "pension loan," "retirement loans," "military pension loans," and "sell my pension." Such consumers would often see online advertisements for "pension loans."

19.     These ads directed consumers to PF-PI's website, uspensionfunding.com, which represented that "[t]hrough a type of money purchase pension plan, Pension Funding LLC transacts a pension buyout and advances you the cash when needed. This pension buyout is not a pension loan; it is a pension lump sum."

20.     PF-PI stated that a "pension buyout is a more convenient and less expensive option for financing unexpected purchases than a credit card or regular loan."

21.     PF-PI further stated that "[n]owhere else can you leverage your military, civil service or corporate pension to secure near-immediate cash. Not at a bank. Banks don't recognize pensions as collateral. Not on a credit card. High

7

EXHIBIT 3
102

interest rates make cash advances too expensive. You can sell 8 years of your future pension stream. At the end of the term, your full pension payments resume back to you. And we don't require any life insurance or report this as a debt to the credit reporting agency. That is our very big advantage."

22. On its website, PF-PI denied that its product was a loan and did not disclose any associated fees or interest rates.

23. PF-PI claimed on its website that the cost to consumers "can be as little as 13 percent" and contrasted its product with "credit card[s]" that charge "18 to 24 percent or more per year in compound interest."

24. Consumers contacted PF-PI either by inputting contact information on the website to receive a call from a PF-PI representative or calling a toll-free number.

25. Consumers spoke to a representative of PF-PI to obtain quotes and begin the application process.

26. In calls with consumers, PF-PI represented that the product was not a loan and that there was no interest rate. PF-PI also represented that it did not require consumers to purchase life insurance and that "we actually purchase the life insurance on your behalf at no cost to you."

27. PF-PI's representatives encouraged consumers to discuss their financial conditions and needs and promised to work with them to customize a pension advance tailored to their financial circumstances. In some instances, the representatives advised consumers that they would benefit from using PF-PI's product because it would not appear on their credit reports, was not taxable, and was better than a home-equity loan.

28. Consumers next received a form letter explaining the transaction and underwriting process.

29.     In the letter, PF-PI again repeated its claims that its product was "<u>a Purchase and Not a Loan</u>." It also asserted that "[o]urs is NOT INTEREST, SINCE OUR PROGRAM IS NOT A LOAN. Our Range is a Cost of Money Rate or a Discount Rate."

30.     In the letter, PF-PI compared the "discount rate" to a "typical mortgage" and claimed that "our participants pay approximately the same or less than your credit card rates (and not the highest rates)."

31.     With the letter, PF-PI sent three quotes for potential lump-sum payments based on different monthly payment amounts. None of the quotes referenced any fees or interest rates. The quotes stated the "Life Insurance Premium Deduction" as $0.

32.     Attached to the letter was a "Financial Information Form" that required consumers to provide employer information, asset and debt information, and credit references. As part of the application process, PF-PI also obtained credit reports.

33.     PF-PI's underwriting department reviewed applications and, if approved, PF-PI sent consumers a second set of forms to be completed, including a "Monthly Home Budget," "Personal Banking Information Form," and a Preliminary Underwriting Questionnaire" requiring life-insurance information, physician-contact information, and a HIPAA authorization to obtain medical records.

34.     PF-PI justified its extensive underwriting efforts by explaining that it "must rely on your promise to continually forward the payments for the next eight years" and that the sale "does not prevent you from redirecting those payments away once we have concluded the arranged transaction with you and you received the lump sum amount."

9

EXHIBIT 3
104

35.     PF-PI further stated that "pensions are not assignable; we cannot perfect a lien against yours, or any person's pension. Our program is only for those people with a proven record and a continuing willingness to honor their obligations. We believe that, with our underwriting policies, we can both provide a service at a fair price and make a profit, which enables us to continue in business. . . . The fact that we are not arranging a loan to you, only arranging for the purchase of a cash stream of payments from you, does not remove the necessity of our underwriting the transaction."

36.     Only after reviewing the underwriting materials did PF-PI make a bona fide offer to consumers.

37.     For consumers who qualified, PF-PI made a lump-sum offer based on a minimum monthly payment amount of $500 for a standard term of 96 months.

38.     PF-PI told consumers that the offer represented the present value of the payments based on a "discount rate."

39.     PF-PI calculated the offer with a computer "estimator" program that multiplied the total amount pledged by the consumer over the 96-month repayment period by 41% and 49% to arrive at upper and lower bounds of a "discounted" range.

40.     The lump sums that consumers received were less than the full amounts promised because the first month's repayment was automatically deducted.

**B.     PF-PI structured transactions that imposed high fees on consumers.**

41.     While soliciting consumers to "sell" their pension income, PF-PI simultaneously solicited investors, often retirees, recruited through a network of financial advisors to invest in the transactions.

10

EXHIBIT 3

105

42.     For the promise of a 6% annual return, investors paid PF-PI an amount sufficient to fund the lump sum paid to a consumer, as well as additional fees and PF-PI's expenses and profits.

43.     Each transaction consisted of seven documents. Only three of the documents were shown to consumers: (1) a purchase-agreement contract between the consumer and the investor; (2) a power of attorney provided by the consumer to PF-PI; and (3) a contract between the consumer and PI. Investors signed several separate contracts and received an offer sheet and a risk document.

44.     The contracts obligated consumers to "remit a specified number of periodic payments" from their future pension payments.

45.     PF-PI did not disclose any fees to consumers in these contracts or elsewhere.

46.     Over the life of the transaction, consumers were obligated to pay back enough money to cover the lump sum, fees, and interest promised to investors, including the following fees:

a.     9% commission for the agent who recruited the investor;

b.     3% commission for the broker who recruited the consumer;

c.     5-9% fee to Pension Funding;

d.     8% fee for a "re-direct" reserve fund to protect against consumers who failed to make payments by directing their pension payment away from PF-PI; and

e.     2.84% fee for a "death reserve fund," also called the "life insurance impound," for PF-PI to self-insure the life of the consumer and from which payments could be made to investors should a consumer die and no other recourse be available.

47.     On average, the transactions had an effective annual interest rate of 28.56%. Moreover, the transactions entered with New York consumers

11

EXHIBIT 3
106

consistently had nominal annual interest rates in excess of both the New York civil usury cap of 16% and the New York criminal usury cap of 25%.

48.     PF-PI did not disclose an annual interest rate to consumers.

49.     PF-PI kept as profit any additional funds that remained after deducting fees and paying the lump sums to consumers, as well as any funds in the reserve funds that were not needed to pay investors.

50.     PF-PI made its entire profit and deducted all fees at the inception of each deal. PF-PI provided ongoing servicing during the life of the transaction.

51.     PF-PI required consumers to grant PF-PI a power of attorney as their agent to open bank accounts in the consumers' names and perform day-to-day transactions in the account.

52.     PF-PI opened or assisted consumers in opening checking accounts in consumers' names into which the consumers would cause their monthly pension payments to be deposited by the pension source. PF-PI then paid investors their promised monthly payments by either (1) moving pension payments from those accounts to investors' accounts or (2) moving pension payments from those accounts into accounts held by Pension Income and then to investors' accounts. PF-PI sent consumers any funds in excess of the monthly payments that remained in the accounts.

53.     PF-PI never applied for or was granted a money transmitter license or exemption from the licensing requirement from the New York State Department of Financial Services or its predecessor agency, the New York State Banking Department, as required by New York Banking Law. There was no agency agreement between PF-PI and investors authorizing PF-PI to receive and transfer monthly pension payments from consumers to investors. On the contrary, in the buyer master agreement with investors PF-PI disclaimed any involvement in the transaction post-closing. PF-PI provided no receipt to consumers confirming that

12

EXHIBIT 3
107

the monthly pension payment was transmitted to investors or any other indication that it was unconditionally obliged to transmit consumers' payments to investors.

**C.    PF-PI aggressively pursued consumers who defaulted.**

54.    The contracts between investors and consumers provided that if a consumer were to re-direct pension payments to a different account or otherwise cause any interruption in the monthly payments, all remaining payments under the contract would immediately become due.

55.    If a consumer disrupted the payments, the investor would have the right to take legal action, including, according to the contracts, "the right to secure payment via punitive or accommodating relief" and "criminal" action.

56.    The contracts contain a "liquidated damages" clause providing that the investor "may bring an action for liquidated damages in an amount equal to the aggregate amount of the unpaid purchased payments."

57.    PF-PI's contracts with investors authorized it to pursue those claims against consumers. The investors relied on PF-PI to collect funds from consumers and handle any breaches.

58.    Immediately after a payment is missed, PF-PI contacts the consumer by phone and email, often threatening litigation within a week of a missed payment.

59.    Shortly thereafter, consumers receive a letter from PF-PI's counsel stating that "all appropriate legal action is taken when delinquent accounts refuse to pay" and warning that PF-PI will sue "to collect this debt."

60.    If consumers still do not make payments, PF-PI either (1) files a state-court complaint for breach of contract and seeks a default judgment, often in a forum far from the consumer's residence, or (2) in the event the consumer is in bankruptcy, files a proof of claim or adversary pleading as a "creditor" in the bankruptcy case.

61.     In these legal actions, PF-PI contends that consumers owe a debt and seeks to enforce liquidated-damages clauses. Specifically, in state court actions PF-PI typically claims that consumers are "indebted" on an "account for money due" and that PF-PI seeks "the amount of all remaining and outstanding periodic payments" for the "default." Likewise, in the bankruptcy context, PF-PI claims that consumers owe a "debt" in the amount of all outstanding payments.

62.     When PF-PI obtains a judgment, often a default judgment, it may seek garnishments from non-pension sources and place liens on assets and property for the full amount of outstanding payments and additional costs and interest associated with the court actions.

**D.     The Individual Defendants operated and controlled PF-PI**

63.     Defendant Covey devised the structure of PF-PI's transaction while he was operating Structured Investments Co., LLC ("SICO"), PF-PI's *de facto* predecessor. Along with Defendant Lichtig, Covey created PF-PI. Through Covey, SICO transferred its website, "estimator" program, and telephone number to PF-PI. PF-PI opened its office at SICO's former address and hired several of SICO's key employees. Covey served as the "Site Manager" of Pension Funding, helped structure the transactions by supplying template contracts from SICO to PF-PI, performed transactions in the consumer bank accounts established by PF-PI, communicated with consumers about originating deals, conducted underwriting, made transaction-approval decisions, and participated in collecting on defaulted transactions, including deciding how and when to take legal action against consumers.

64.     Defendant Lichtig along with Defendant Covey created PF-PI. Lichtig is the managing member of Pension Income. He was involved in the key decisions and day-to-day operations of PF-PI, including advertising, contract drafting, and devising strategies to avoid regulatory oversight. Lichtig also brought in "capital"

for PF-PI by soliciting and securing investors, in part through a network of financial advisors, and purchasing contact lists to generate leads.

65.     Defendant Hofelter is the organizer and managing member of Pension Funding as well as the Contracts Manager and custodian of books and records for Pension Income. He opened and performed transactions in the consumer bank accounts established by PF-PI, made monthly payments to investors, and typically served as the point-of-contact for consumers. For every deal, Hofelter handled the transactional documents and signed on behalf of PF-PI. Hofelter also participated in lawsuits brought against consumers in default, including by filing affidavits attesting to the existence of the alleged debt.

## Count I
### Unfair Acts or Practices in Violation of the CFPA
### (Asserted by the Bureau and the Superintendent)

66.     Plaintiffs reallege and incorporate by reference paragraphs 1-65 of this Complaint.

67.     An act or practice is unfair if it causes or is likely to cause substantial injury to consumers that is not reasonably avoidable by consumers and is not outweighed by countervailing benefits to consumers or to competition. 12 U.S.C. § 5531(c)(1).

68.     In numerous instances, in connection with marketing the loans in question, Defendants failed to disclose or misrepresented the interest rate associated with the loans and failed to disclose or denied the existence of fees.

69.     These acts and practices were likely to cause substantial injury to consumers because they prevented consumers from understanding the costs of the loans in question and from comparing them to potential alternatives. Accordingly, many consumers likely paid more as a result of using Defendants' product than they would have by using alternative sources of credit. Moreover, many consumers

15

EXHIBIT 3
110

lost the opportunity to receive pension payments in their retirement years although their pensions were designed to provide an important source of income when the consumers either no longer worked or worked limited hours.

70. This injury was not outweighed by countervailing benefits to consumers or competition. Rather, consumers and competition are harmed when consumers are denied information necessary to evaluate the cost of a credit product and potential alternatives.

71. The injury was not reasonably avoidable by consumers.

72. Therefore, Defendants engaged in unfair acts or practices in violation of the CFPA, 12 U.S.C. § 5536(a)(1)(B).

## Count II
### Deceptive Acts or Practices in Violation of the CFPA
### (Asserted by the Bureau and the Superintendent)

73. Plaintiffs reallege and incorporate by reference paragraphs 1-65 of this Complaint.

74. In numerous instances, in marketing the loans in question, Defendants represented, directly or indirectly, expressly or by implication, that the product:

      a.    did not have an interest rate associated with it;

      b.    had costs associated with it that were comparable to interest rates as low as 13%, or less than 18-24%; and

      c.    did not require life insurance or have other fees associated with it.

75. These material representations were false and misleading. For example, an effective interest rate of more than 28% was typically associated with the product.

16

EXHIBIT 3
111

76.     Therefore, Defendants engaged in deceptive acts or practices in violation of the CFPA, 12 U.S.C. § 5536(a)(1)(B).

### Count III
### Abusive Acts or Practices in Violation of the CFPA
### (Asserted by the Bureau and the Superintendent)

77.     Plaintiffs reallege and incorporate by reference paragraphs 1-65 of this Complaint.

78.     An act or practice is abusive if it (1) "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service," (2) "takes unreasonable advantage of . . . a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service," or (3) "takes unreasonable advantage of . . . the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." 12 U.S.C. § 5531(d)(1), (2).

79.     In numerous instances, Defendants obscured the true nature of the credit transaction by denying that their product was a loan and instead referring to it as a pension advance, pension buyout, pension lump sum, money purchase pension plan, purchase of a cash stream of payments, or purchase.

80.     In numerous instances, Defendants failed to disclose or denied the existence of an interest rate and fees associated with the loans.

81.     In numerous instances, Defendants advised consumers on whether or not a particular transaction was in their best financial interest. Notably, Defendants told consumers that their product was preferable to a home-equity loan or a credit card. Yet Defendants' loans typically had an effective interest rate of more than 28%, while the effective interest rates associated with either home-equity loans or credit cards during the same period were typically much lower.

EXHIBIT 3
112

82.    In numerous instances, Defendants implicitly threatened criminal prosecution should consumers cease to make payments.

83.    Because Defendants obscured the true nature of the transactions, failed to disclose and misrepresented the costs of the loans, and gave consumers misleading advice, consumers could not clearly understand the risks or costs of the loans or effectively compare the loans to potential less costly alternatives.

84.    By failing to disclose and misrepresenting these aspects of the loans, Defendants materially interfered with the ability of consumers to understand the risks or costs of the loans.

85.    By failing to disclose and misrepresenting these aspects of the loans, Defendants took unreasonable advantage of a lack of understanding on the part of consumers of material risks, costs, or conditions of the loans.

86.    By failing to disclose and misrepresenting these aspects of the loans, Defendants took unreasonable advantage of consumers' inability to protect their interests in selecting or using the loans.

87.    Therefore, Defendants engaged in abusive acts or practices in violation of the CFPA, 12 U.S.C. § 5536(a)(1)(B).

## **Count IV**
### **Usury**
### **(Asserted by the Superintendent)**

88.    Plaintiff Superintendent realleges and incorporates by reference paragraphs 1-65 of this Complaint.

89.    Pursuant to New York General Obligations Law ("GOL") § 5-501, it is unlawful to charge interest upon the loan or forbearance of any money, goods, or things in action, except as otherwise provided by law, at a rate exceeding that prescribed in Section 14-a of the New York Banking Law.

18

EXHIBIT 3
113

90.     New York Banking Law § 14-a(1), states that the maximum rate of interest to be charged, taken, or received upon a loan or forbearance of any money, goods, or things in action is sixteen per centum (16%) per annum.

91.     In the course of making loans to consumers in New York, Defendants repeatedly charged and received interest in excess of 16%, in violation of GOL § 5-501 and New York Banking Law § 14-a(1).

### Count V
### False and Misleading Advertising of Loans
### (Asserted by the Superintendent)

92.     Plaintiff Superintendent realleges and incorporates by reference paragraphs 1-65 of this Complaint.

93.     Pursuant to New York Banking Law § 350, no entity shall advertise, print, display, publish, distribute, or broadcast or cause or permit to be advertised, printed, displayed, published, distributed, or broadcasted, in any manner whatsoever any statement or representation with regard to the rates, terms, or conditions for the loaning of money, credit, goods, or things in action which is false, misleading, or deceptive.

94.     Through their websites, and in their direct-to-consumer marketing calls with consumers, Defendants represented, directly or indirectly, that their financial products constituted sales, not loans; that there were no fees; that there was no interest rate associated with their products; and that their products did not require life insurance.

95.     In their contracts with consumers, Defendants persisted in the false, misleading, and deceptive representations of their online and direct-to-consumer marketing by characterizing the transactions as "a valid sale of a stream of income received in the pensioner's checking account in the form of payments sold as they are received by Pensioner in the future." Defendants thereby falsely presented

19

EXHIBIT 3
114

these transactions as legal sales, rather than loans charging illegal rates of interest under New York's usury laws.

96.     By representing to consumers that they were selling their pensions, rather than obtaining a loan, and by omitting in their advertisements to consumers the applicable interest rates, fees, and life insurance requirement, Defendants advertised and distributed statements that were false, misleading, and deceptive regarding the rates, terms, and conditions for the loaning of money or credit, including the legality of Defendants' loans, in violation of New York Banking Law § 350.

**<u>Count VI</u>**
**Intentional Misrepresentation of a Material Fact**
**Regarding a Financial Product**
**(Asserted by the Superintendent)**

97.     Plaintiff Superintendent realleges and incorporates by reference paragraphs 1-65 of this Complaint.

98.     Pursuant to Section 309 of the New York Financial Services Law, this Court has the power to grant an injunction to restrain a threatened or likely violation of the Financial Services Law or the Banking Law.

99.     Section 408 of the Financial Services Law makes it unlawful for any person to commit an intentional fraud or make an intentional misrepresentation of material fact with respect to a financial product or service.

100.    Defendants intentionally misrepresented that they purchased pension income when, in fact, they were engaged in illegal lending activity and lending money at usurious rates.

101.    Defendants also intentionally misrepresented or failed to disclose the interest rate and fees associated with the loans.

20

EXHIBIT 3
115

102.   Defendants also intentionally misrepresented to consumers that they could be subject to "punitive . . . relief" and "criminal" action if they caused any disruption in the monthly payments to investors.

103.   Those facts would have been material to consumers in deciding whether to obtain these loans and whether to repay the obligation.

104.   Defendants' false and misleading misrepresentations constitute intentional misrepresentations of material facts to consumers in violation of Section 408 of the Financial Services Law.

### Count VII
### Unlicensed Money Transmitting
### (Asserted by the Superintendent)

105.   Plaintiff Superintendent realleges and incorporates by reference paragraphs 1-65 of this Complaint.

106.   Pursuant to Section 641 of the New York Banking Law, no person shall engage in the business of selling or issuing checks, or engage in the business of receiving money for transmission or transmitting the same, without a money transmitter license obtained from the Superintendent pursuant to New York Banking Law Article XIII-B, nor shall any person engage in such business except as an agent of a licensee or as an agent of a payee.

107.   Defendants have not obtained a money transmitter license from the Superintendent, and are not appointed agents of a licensee or investors.

108.   Defendants received or transmitted money from consumers' accounts to investors' accounts, often through PF-PI's accounts.

109.   By receiving or transmitting money from consumers' accounts to investors' accounts, often through PF-PI's accounts, Defendants engaged in the business of money transmitting.

21

EXHIBIT 3
116

110.   By receiving or transmitting money without first obtaining a license from the Superintendent or entering into an agency agreement with investors authorizing such receipt or transmission on behalf of investors, Defendants engaged in the business of transmitting money without a license.

111.   Therefore, Defendants engaged in unlicensed money transmitting in violation of Section 641 of the New York Banking Law.

## PRAYER FOR RELIEF

Wherefore, the Plaintiffs request that the Court:

1.   award injunctive relief as may be necessary to prevent consumer injury during the pendency of this action and to preserve the possibility of effective final relief;

2.   permanently enjoin Defendants from committing future violations of the CFPA or any provision of "Federal consumer financial law," as defined by 12 U.S.C. § 5481(14);

3.   permanently enjoin Defendants from violating the New York State Banking and Financial Services laws;

4.   grant additional injunctive relief as may be just and proper;

5.   award damages or other monetary relief against Defendants;

6.   order Defendants to pay redress to harmed consumers;

7.   order disgorgement of ill-gotten revenues from Defendants;

8.   impose civil money penalties against Defendants;

9.   order Defendants to pay Plaintiffs' costs and fees incurred in connection with prosecuting this action; and

10.   award additional relief as the Court may determine to be just and proper.

EXHIBIT 3

117

Dated: August 20, 2015            Respectfully submitted,

Anthony Alexis (DC Bar #384545)
*Enforcement Director*

Jeffrey Paul Ehrlich (FL Bar #51561)
*Deputy Enforcement Director*

John C. Wells (DC Bar # 491292)
*Assistant Litigation Deputy*


/s/ Carmen L. Christopher
Carmen L. Christopher (CA Bar #231508)
    Email: carmen.christopher@cfpb.gov
    Telephone: (312) 610-8961
Thomas G. Ward (IL Bar #6291011)
    Email: thomas.ward@cfpb.gov
    Telephone: (312) 610-8966
Maxwell S. Peltz (CA Bar #183662)
    Email: maxwell.peltz@cfpb.gov
    Telephone: (415) 633-1328
    Local Counsel for Thomas G. Ward
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC 20552
Facsimile: (312) 610-8971

*Attorneys for the Consumer Financial Protection Bureau*

23

EXHIBIT 3
118

Eric T. Schneiderman
Attorney General of the State of New York


/s/ Amy McFarlane*_____
Amy McFarlane (CA Bar #229214)
    Email:  Amy.McFarlane@ag.ny.gov
    Telephone: (212) 416- 6195
*Assistant Attorney General*
Office of the New York State Attorney General
120 Broadway
New York, NY 10271-0332
Facsimile: (212) 416- 6015

*Attorney for the Acting Superintendent of*
*Financial Services of the State of New York*

*Ms. McFarlane concurs in this filing's content
and authorized the filing