# Exhibit 4
# to Supplemental Declaration of Alanna B. Carbis in Support of Reply Memorandum of Law in Support of Petition to Enforce Civil Investigative Demand and Request for Judicial Notice

EXHIBIT 4
120

NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES

----------------------------------------------------------------------------X

In the Matter of

Future Income Payments, LLC,

                   Respondent.

----------------------------------------------------------------------------X

## CONSENT ORDER

WHEREAS, the New York State Department of Financial Services ("DFS" or "Department") commenced an investigation, pursuant to New York State Banking and Financial Services Laws, of Future Income Payments, LLC ("FIP") (the "Investigation");

WHEREAS, the Department investigated whether FIP violated New York Banking and Financial Services Laws by lending without a license, making usurious loans, conducting money transmitting without a license, and making intentional misrepresentations regarding a financial product or service in the State of New York from 2011 through the present (the "Relevant Period");

WHEREAS, the Department concluded that FIP entered into loan agreements pursuant to which New York pensioners borrowed a lump sum of money in exchange for some or all of the pensioner's monthly pension payments;

WHEREAS, the Department concluded that FIP made loans in New York State without a lending license;

WHEREAS, the Department concluded that FIP charged a rate of interest on the loans they entered into with New York pensioners that exceeded the rate permitted by New York Banking and General Obligations Laws;

EXHIBIT 4
121

WHEREAS, the Department concluded that FIP transmitted money to and from New York State without a money transmitter license;

WHEREAS, the Department concluded that FIP misrepresented to New York pensioners the legal status of the transactions by characterizing the loans as sales of an asset, misrepresented the interest charged by calling it a discount, and omitting the annual percentage rate ("APR");

WHEREAS, FIP cooperated with the Department's Investigation by providing all requested information and material to the Department.

NOW, THEREFORE, the Department, FIP, and its owner, Scott Kohn, are willing to resolve the matters cited herein in lieu of proceeding by notice and a hearing.

## FINDINGS

The findings of the Investigation are as follows:

### Respondent's Organization

1.      FIP is a Delaware limited liability company, formed in April 2011, which has conducted business, including in New York State, from 18300 Von Karman Ave., Suite 410, Irvine, California 92612, and from 3535 East Coast Highway, #119, Corona del Mar, California 92625. FIP was formerly known as Pensions, Annuities & Settlements, LLC. FIP has or had the following marketing affiliates, all operating out of 18300 Von Karman Ave., Suite 410, Irvine, California 92612: Cash Flow Investment Partners, LLC (http://www.lumpsum-settlement.com); BuySellAnnuity, Inc. (http://www.buysellannuity.com); and Pension Advance, LLC (http://www.pensionadvances.com and http://www.lumpsum-pensionloans.com). FIP's business model is to solicit pensioners, including in New York, through the websites of its marketing affiliates and enter into contracts with pensioners in which pensioners receive a lump sum of money in exchange for some or all of the pensioners' monthly pension payments for a fixed period of time, generally five or ten years. FIP also enters into contracts with investors, who

2

EXHIBIT 4
122

provide money for the lump sum cash payments and receive some or all of pensioners' monthly pension payments.

2.      Scott Kohn ("Owner") owns 100% of FIP and is its President, Secretary, and Treasurer. Mr. Kohn is FIP's sole Member, as defined in FIP's articles of formation, and as such has complete authority, power, and discretion to make any and all decisions regarding FIP. Mr. Kohn is also the sole owner of FIP's affiliated marketing entities, Cash Flow Investment Partners, LLC, BuySellAnnuity, Inc., and Pension Advance, LLC.

### Background

3.      During the Relevant Period, FIP advertised to and solicited pensioners in New York and across the nation through its marketing affiliates' websites and other websites.

4.      FIP advertised its product as a way for pensioners to obtain cash quickly to meet their immediate needs and long-term goals. Calling the product a "lump sum," "pension buyout," and "pension advance," FIP's websites stated that it accepted most types of pension payments, including pensions from private companies, state or federal government pensions, military pensions, fire and police department pensions, and teachers' pensions.

5.      FIP also received referrals from other pension lenders and bought consumer leads from websites similar to its own websites.

6.      FIP paid third parties to steer internet-search traffic to its websites, including a website with the uniform resource locator "http://www.lumpsum-pensionloans.com," by targeting consumers who conducted searches for FIP-approved phrases such as "personal loans," "pension loan," "online loan," or "military retirement loan," among others.

3

EXHIBIT 4
123

7.    Nevertheless, FIP instructed its employees to avoid any mention of loans. Its telephone marketing script for inbound calls from interested consumers warned employees that "saying or mentioning 'Pension Loan' or the word 'loan' is an autofail."

8.    In addition, the FIP product training manual stated that FIP purchases "future pension payments, and pay[s] sellers a lump sum in exchange for those payments" and that its product "is not a loan," but acknowledged that "the IRS views it similar to a loan."

9.    Despite this training and FIP's characterization of its products as sales in its online advertising and promotional materials, between 2011 and the present date, some FIP employees referred to FIP's product as a loan when communicating with consumers. The Department discovered instances of FIP employees introducing themselves as calling from "Pension Loans" or "Lumpsum Pension Loans"; using email addresses with the domain name of "@lumpsum-pensionloans.com"; and at least one employee referring to a consumer's "loan application" when communicating with the consumer and another employee instructing a consumer to submit certain documents "to make the loan possible."

10.    Consumers referred to the product as a loan and FIP as a lender in their communications with FIP. On occasion, FIP corrected consumers who called their product a loan or FIP a lender.

### Pension loan offer

11.    Consumers contacted FIP through its websites or by phone to obtain a quote and begin the application process. Representatives of FIP communicated with pensioners by phone, letter, or email to provide a quote for the loan amount and begin collecting information and documents from the pensioner to allow FIP to complete the underwriting process.

12.    Pensioners were asked to submit a number of documents relating to their pension and financial situation, as well as documents evidencing their identity and marital status, to

EXHIBIT 4
124

undergo a credit check and bankruptcy review, and to answer certain questions regarding their medical history. Many pensioners were asked to submit proof of life insurance as well.

13.     After verifying the pensioners' information and deciding to extend an offer, FIP proposed to New York pensioners a lump sum of cash in exchange for a specified amount of the pensioners' monthly pension payments.

14.     To complete the loan process, FIP required New York pensioners to complete and sign several documents provided by FIP. FIP used several versions of the documents included in what FIP referred to as the "Seller Packet" during the Relevant Period.

15.     The "Seller Packet" consisted of approximately nine documents: (1) a contract entitled "Future Income Stream Purchase and Sale Agreement," "Buyer and Pensioner Purchase Agreement for Purchase of Future Income Stream," or "Future Income Payment Purchase and Sale Agreement"; (2) Transaction Details; (3) Authorization for Automatic Payments; (4) Disclosures and Acknowledgments; (5) Certificate of Marital Status; (6) Security Guaranty and Indemnification Agreement; (7) Purchase Agreement; (8) Employment Verification Form; and (9) W9—Request for Taxpayer Identification Number and Certification.

16.     In addition, depending on which version of the agreement was used, New York pensioners were asked to submit some or all of the following documents: (1) proof of life insurance policy with death benefits amount; (2) collateral assignment form assigning the life policy benefits to a designated assignee; (3) letter from the pensioner's pension payor confirming pension eligibility, amount, and term; (4) photographic identification, usually a driver's license; (5) voided check; (6) if previously married, a marital support document; (7) if the pensioner was self-employed, a copy of his or her personal or corporate tax return; and (8) bill showing telephone or cellular phone details.

5

EXHIBIT 4

17.     Once FIP received and verified all documents, New York pensioners executed a loan agreement with FIP.

### The loan agreement

18.     FIP's loan agreement provided that the pensioner would receive a "one-time, lump sum payment" in exchange for a specified amount of the pensioner's monthly pension payment to be paid monthly for a specified number of months.

19.     Although the agreements were between FIP and pensioners, the agreements provided that FIP intended to sell and would sell the monthly pension payments remitted by pensioners and assign FIP's rights under the agreement to third parties. The investors who provide the lump sum funds that were paid to pensioners were the subsequent purchasers to whom pensioners' repayment obligations were transferred.

20.     The transactions contractually obligated pensioners to repay the lump sum loan amounts by monthly payments over the term set by the loan agreement.

21.     Until 2015, the pensioners personally guaranteed repayment of the lump sum loan amounts by monthly installment payments over the term set by the loan agreement.

22.     Upon receipt of the lump sum amount into the pensioners' own bank accounts, the pensioners instructed the bank or financial institution at which their pension payments were deposited to transfer a specified amount of the pensions into a FIP-controlled account. To facilitate collection of the obligated payments, pensioners executed an authorization for electronic funds transfer granting FIP the power to collect the monthly pension installment payments from the pensioners' accounts.

23.     Many pensioners also used credit or debit cards to make their monthly payments.

6

EXHIBIT 4
126

24.     FIP deducted $300 from the lump sum amount as an account set-up fee and servicing fee, and until September 2014 charged pensioners a "Management Fee" of $10 per month for "services rendered in connection with the collection of cash flows."

25.     FIP's contracts with investors provided that pensioners would remit their monthly pension payments to a FIP master account, called the "Payment Account," and FIP would thereafter remit the payments to the investor.  The investor contracts did not include any information regarding the set-up and management fees FIP charged pensioners and took from their lump sum and monthly installment payments.

26.     Although FIP's agreement referred to the transaction as a "sale" or "valid sale" and stated that the product is not a loan, the transaction lacked features of a sale, such as notification to third parties or the transfer of tax liability to the "purchaser."  Rather, the transaction had all the indicia of a loan, based upon which the Department concluded that the transaction was a loan transaction and not a purchase transaction.  For instance:

> a.     The agreements provided for an advance of money to pensioners and, conditioned only on the failure of their pension payor to continue making payments, pensioners' promise to repay in installments over a period set by the agreements.
>
> b.     The agreements acknowledged that the lump sum amount was "significantly less" than the amount that the pensioner would pay under the agreement, and some stated the difference between the amount pensioners received as a lump sum and the amount they would have collected and retained if the transaction with FIP had not taken place.  This difference, referred to in the agreements as the "discount," was, in fact, the

7

EXHIBIT 4
127

interest that the pensioner paid over the course of the loan. The APR, however, was not disclosed.

c. The loan agreements had stringent recourse provisions in the event a pensioner failed to make the monthly payments: any disruption, interruption, decrease, or elimination of payments was deemed a material breach of the contract and caused all remaining and unpaid payments to be immediately due and payable.

d. The agreements also provided that any breach could require a pensioner to pay FIP's and any subsequent purchasers' legal fees and costs incurred pursuing a claim against the pensioner.

e. Pensioners who failed to make timely payments were charged late fees equal to 1.5% of the delinquent payment. Payments returned to FIP for insufficient funds resulted in a $35 insufficient funds fee, in addition to any late fees.

27.     At least twenty-nine of the agreements FIP entered into with New York pensioners contained provisions stating that any "intentional violation" of the pensioner's obligations under the contract that "deprived [FIP] of the economic benefits contemplated by this agreement could under certain circumstances, constitute criminal conduct, punishable by criminal fines or imprisonment."

### Transactions with New York pensioners

28.     From March 2012 through April 2015, approximately 282 New York pensioners executed 292 agreements with FIP.

29.     FIP made loans to New York pensioners ranging in amounts from $2,500 to $58,500.

8

EXHIBIT 4
128

30.     Seven New York pensioners obtained loans that were greater than $25,000.  The remaining 275 loan agreements were for less than $25,000.

31.     FIP's agreements with New York pensioners were for terms of three, five, and ten years.

32.     FIP loaned New York pensioners a total of $2,461,900.  As of October 7, 2016, New York pensioners have repaid $1,936,711.94.  FIP's projected collection, if all New York pensioners paid in accordance with the terms of their agreements, is $8,870,132.  FIP's profit would be more than 250% of the principal amount loaned to the pensioners.

33.     The vast majority of New York pensioners who entered into agreements with FIP paid simple interest rates in excess of 16% per annum, and several paid simple interest rates of more than 130% per annum.  A "simple" interest rate is calculated by dividing the amount of interest paid in an annual period by the amount of the loan.  It does not take into account the effects of compounding or inflation.

34.     New York pensioners have, as of October 7, 2016, paid $2,070 in late and insufficient fund fees to FIP.

35.     FIP does not have, and has never had, a lending license from the Department of Financial Services.

36.     FIP does not have, and has never had, a money transmitter license from the Department of Financial Services.

**Violations**

37.     The Department finds that FIP violated New York Banking Law Section 14-a and General Obligations Law Section 5-501 by charging pensioners interest rates on loans in excess of New York's civil usury caps.

9

EXHIBIT 4
129

38.     The Department finds that FIP violated New York Banking Law Section 340 by engaging in the business of making loans in New York without a license.

39.     The Department finds that FIP violated New York Banking Law Section 641 by receiving money for transmission and transmitting money without a license.

40.     The Department finds that FIP violated New York Financial Services Law Section 408 by intentionally misrepresenting material facts with respect to a financial product or service.

## AGREEMENT

IT IS HEREBY UNDERSTOOD AND AGREED by FIP and its Owner, and all officers, subsidiaries, affiliates, successors, assigns, agents, representatives, employees, and subcontractors (hereinafter collectively referred to as "Respondents"), that:

### Cease and desist

41.     FIP and its Owner, subsidiaries, affiliates, successors, assigns, agents, representatives, employees, and subcontractors shall cease all consumer-related transactions within New York State or with any New York resident to the extent the consumers provide a New York State address, zip code, or telephone number area code, and shall not participate in any money transmitting activity in New York State, except to the extent required to fulfill their obligations pursuant to this Consent Order.

### Injunctive Terms

42.     All websites, written advertisements, endorsements, or other marketing and promotional materials of FIP, its Owner, and their affiliates shall clearly and conspicuously state: "These products are not available in New York."  For purposes of this Consent Order, the term "clearly and conspicuously" means that the statement being disclosed is of such size, color, contrast, and/or audibility and is so presented as to be readily noticed and understood by the

10

EXHIBIT 4
130

person to whom it is being disclosed.  In interactive media, this disclosure shall also be
unavoidable (*i.e.*, no click-through required to access it) and shall be presented before a
consumer incurs any financial obligation or provides any personally identifiable or financial
information.

43.     FIP and its Owner represent that the websites of third parties that market
Respondents' pension advance business do not accept any applications from or store information
submitted by New York applicants.

44.     FIP shall not purchase, distribute, promote, or otherwise cause to exist any New
York State-specific advertisement, marketing, or promotional material.  To confirm compliance
with the prohibitions of the Consent Order, FIP will provide DFS with representative copies of
all advertisements (including but not limited to website materials, direct mailings, and paid
search traffic reports) published or mailed at the time of the execution of this Consent Order
("Effective Date," as described in paragraph 95), and thereafter by January 31st and June 30th
for the next two years.

45.     Within thirty days from the Effective Date, and thereafter annually for five years,
FIP shall train all employees, agents, representatives, and subcontractors on the obligations as set
forth in paragraph 41 of this Consent Order that FIP may not engage in any consumer lending
activity or in the business of purchasing future pension income as described in this Consent
Order, in New York or with any New York resident.  No later than thirty days after completing
such training, FIP will certify initially and annually in writing to DFS that all of FIP's
employees, agents, representatives, and subcontractors have received such training.

### Consumer information

46.     FIP and all persons who are in active concert or participation with it, who have
actual notice of this Order, whether acting directly or indirectly, may not disclose, use, or benefit

11

### EXHIBIT 4

from New York consumer information, sell any New York consumer information or leads to others, or use New York consumer information or leads collected through their pension advance business, including the name, address, telephone number, email address, Social Security number, other identifying information, or any data that enables access to a New York consumer's account (including information related to a credit card, bank account, pension account, or other financial account, and including any bank accounts used by FIP to receive a consumer's pension payments), that FIP obtained or created in connection with their pension advance business.

47.     Notwithstanding the prohibition in paragraph 46, FIP may disclose such information: (a) to DFS; (b) to the third party administrator discussed in paragraph 56; (c) to another government agency; or (d) as required by law, regulation, or court order, to the extent such information is in the possession, custody, or control of FIP.

### Reformation, forgiveness, and refunds

48.     FIP shall offer to reform and, subject to New York pensioners' specific consent, shall reform the agreements previously obtained by New York pensioners as follows: the total amount owed for each agreement shall be revised to equal only the lump sum advanced pursuant to the agreements with FIP. The reformed agreements shall reflect that pensioners shall have no further payment obligation beyond the lump sum amount set forth in their agreements. All payments already made by New York pensioners shall be applied to the lump sum amounts.

49.     FIP will forgive all amounts due in excess of the amount advanced. FIP represents that this forgiven amount will total $6,348,232 across 292 transactions.

50.     All New York pensioners who, as of the Effective Date, have made payments equal to or in excess of the lump sum amounts shall have no further payment obligations. FIP will provide notice to such pensioners that their payment obligations have been satisfied and that they are released from any further payment obligations.

12

EXHIBIT 4
132

51.     FIP will refund to New York pensioners who have paid more than their lump sum
amounts the difference between the sum pensioners paid as of the Effective Date and the lump
sum amount provided in their agreements.

52.     To the extent that FIP made reports concerning New York pensioners to any
credit bureau, FIP will report as satisfied the obligations of all New York pensioners who have
made payments equal to or in excess of the lump sum amounts they received.

53.     FIP and its employees, agents, representatives, and subcontractors shall not
collect, or attempt to collect, any payment or fee from New York pensioners who have repaid the
amounts advanced to them.  All collection activity for such transactions shall cease on the
Effective Date.  As to New York pensioners who have not yet repaid the total amounts advanced
to them, FIP shall not seek to collect any amounts in excess of the outstanding unpaid portion
owed under their agreement.  Upon payment of the lump sum amounts, FIP shall provide each
New York pensioner with notice that his or her payment obligations are satisfied and that he or
she is released from any further payment obligations, and, to the extent FIP reported any New
York pensioner to any credit bureau, FIP will report the agreements as satisfied.

54.     FIP shall cease charging New York pensioners late or insufficient fund fees.

55.     New York pensioners who have paid late or insufficient fund fees shall be
refunded all such fees, an amount totaling in the aggregate $2,070 as of the Effective Date.

### Third party administrator

56.     As soon as practicable, but no later than thirty days from the Effective Date, DFS
shall select an independent third party administrator ("TPA") to review and administer the
reformation, forgiveness, and refund of agreements with New York pensioners, as provided in
paragraphs 48 through 55 of this Consent Order.  FIP will retain the TPA after the Department's
review and approval of the retainer agreement ("TPA Agreement").  FIP shall be fully and solely

13

EXHIBIT 4
133

responsible for all proper fees, expenses, and disbursements of the TPA in connection with this
reformation, forgiveness, and refund process.

57.     The TPA shall, as part of its operations, establish and maintain throughout the
duration of its obligations pursuant to this Consent Order, multiple cost-free means for affected
New York pensioners to contact it, including an electronic mail address, a website, and a toll-free
telephone number.

58.     Within forty-five days after retention of the TPA, FIP shall:

     a.    Provide DFS and the TPA the most recent mailing address, email address,
and telephone numbers for each New York pensioner; and

     b.    Provide the TPA with all information and data for New York pensioners in
its possession or custody, including but not limited to account records,
payment histories, contracts, and communication records.

59.     The TPA may request from FIP any information and data it reasonably believes it
will need to fulfill its obligations under this Consent Order, and FIP shall supply the requested
information and data within seven days of receiving such a request from the TPA.

60.     The TPA shall, pursuant to the procedures, requirements, and standards set forth
in this Consent Order and the TPA Agreement:

     a.    Within forty-five days of receiving all information from FIP, determine
the amount to be paid by FIP to or outstanding from New York
pensioners;

     b.    Provide a report to DFS for its review of the final determination of
amounts to be paid by FIP to or outstanding from New York pensioners;
and

14

EXHIBIT 4
134

      c.      Within thirty days of providing the report described in paragraph 60(b),

provide notice to all New York pensioners who have not paid their lump

sum amounts of the amount that such pensioners may pay to discharge

their obligations, and will include with such notice a letter from the

Department, in the a form to be approved by the Department in its sole

discretion.

61.      Within thirty days of the TPA providing its report of its determination of all

amounts owed to New York pensioners, as provided in paragraph 60(b), FIP shall wire-transfer

to the TPA the total refund amounts owed by FIP to New York pensioners.

62.      Within thirty days after receipt of the total refund amount from FIP, the TPA shall

deposit in the facilities of the U.S. Post Office, for delivery by prepaid first-class mail to each

New York pensioner to whom FIP owe a refund, a check in the required amount, payable to the

individual pensioner. All checks must be valid for six months. Such payment shall be

accompanied by a letter from the Department, in a form to be approved by the Department in its

sole discretion.

63.      For any payment to a New York pensioner that is returned to the TPA as

undeliverable or not deposited within six months, the TPA shall conduct a reasonable search, as

provided in the TPA Agreement, for a current address. The TPA may cancel checks not

deposited within six months. Should the search show a more current address, the TPA shall re-

issue a check valid for six months in the amount of the returned or un-deposited check and send

the reissued check to the more current address within fifteen days in the manner provided in

paragraph 62. After doing so. no further action shall be required by the TPA to complete the

mailing process.

64.      As shall be provided in the TPA Agreement, the TPA shall provide regular reports

to the Department regarding the total amount of refunds provided to New York pensioners; the

15

EXHIBIT 4
135

number and amount of refund payments returned as undeliverable to the TPA, never deposited, or otherwise unfulfilled; and the results of the address search and check re-posting process described in paragraph 63.

65. In the event that a New York pensioner does not cash his or her check before the expiration date of the check or the check was returned after the TPA re-posts the check as described in paragraph 63, the TPA shall send to FIP any refund amounts that were undeliverable.

66. The TPA's obligations under this Consent Order are satisfied when the process described in paragraphs 57 through 1 is completed.

67. FIP will service the transactions of New York pensioners who have not paid their lump sum amount as of the date of the report of the TPA's final determination, as described in paragraph 60(b), until such pensioners satisfy any agreed-upon repayment obligation. New York pensioners may petition FIP for modification of their repayment obligations, and FIP may provide modification to the benefit of such pensioners or, alternatively, payment forgiveness.

**Monetary penalty**

68. FIP shall pay a civil penalty of FIVE HUNDRED THOUSAND DOLLARS ($500,000) to DFS within forty-five days of the Effective Date. The payment shall be in the form of a wire transfer in accordance with instructions provided by DFS.

69. FIP agree that they will not claim, assert, or apply for a tax deduction or tax credit with regard to any U.S. federal, state, or local tax, directly or indirectly, for any portion of the civil monetary penalty paid pursuant to this Consent Order.

**Data security**

70. FIP shall destroy all consumer information within their possession, custody, or control that was collected at any time prior to the Effective Date for New York pensioners after

EXHIBIT 4
136

they report any satisfactions in a manner that is consistent with New York law and best practices

in data security.  The TPA shall review FIP's manner and execution of consumer information

deletion, take necessary steps to ensure that FIP complete the deletion in the manner specified,

and report to the Department upon completion of this process.

71.     Thereafter, FIP shall ensure that upon satisfaction of any agreed-upon repayment

obligation, the consumer information of New York pensioners within FIP's possession, custody,

or control is destroyed in a manner consistent with New York law and best practices in data

security.  FIP shall confirm such destruction in the reports to the Department described in

paragraph 75.

**Reporting requirements**

72.     For five years from the Effective Date, FIP must notify the Department of any

development that may affect compliance with the obligations arising under this Order, including

but not limited to: a dissolution, assignment, sale, merger, or other action that would result in the

emergence of a successor company; the creation or dissolution of a subsidiary, parent, or affiliate

that engages in any acts or practices subject to this Order; the filing of any bankruptcy or

insolvency proceeding by or against FIP; or a change in FIP's name or address.  FIP must

provide this notice, if practicable, at least thirty days before the development, but in any case no

later than fourteen days after the development.

73.     Within seven days of the Effective Date, FIP must:

a.      Designate at least one telephone number and email, physical, and postal

address as points of contact, which the Department and the TPA may use

to communicate with FIP;

b.      Identify all businesses for which FIP or its Owner is the majority owner,

or that those entities or persons directly or indirectly control, by providing

17

**EXHIBIT 4**

137

all of those businesses' names, telephone numbers, and physical, postal, email, and internet addresses; and

c.   Describe the activities of each business identified in (b), including the products and services offered, and the means of advertising, marketing, and sales; and

d.   Describe in detail FIP's or its Owner's involvement in any consumer transaction business for which they perform services in any capacity or which they either wholly or partially own, including their applicable title, role, responsibilities, participation, authority, control, and ownership.

74.   For five years from the Effective Date, FIP must report any change in the information required to be submitted under paragraph 72 at least thirty days before the change or as soon as practicable after learning about the change, whichever is sooner.

75.   Within ninety days after completion by the TPA of its obligations as set forth in paragraphs 57 through 1, and every six months thereafter, FIP shall submit to the Department an accurate written compliance progress report, which, at a minimum, describes in detail New York pensioners' current account status; any modification to or forgiveness of New York pensioners' payment obligations; whether New York pensioners have completed repayment of their lump sum amounts, and, if so, provides a copy of release letters; confirms the destruction of all consumer information for those New York pensioners who have discharged their obligations, as described in paragraphs 70 and 71; and any other ways in which the FIP has complied with this Order.

18

EXHIBIT 4
138

76.     FIP shall, upon request by DFS, provide all documentation and information reasonably necessary for the Department to verify compliance with this Consent Order within fourteen days of receiving a written request from the Department.

### Other relief

77.     FIP submit to the authority of the Department to effectuate this Consent Order.

78.     FIP will cease and desist from engaging in any acts in violation of the New York Banking and Financial Services Laws and shall comply with said laws.

79.     FIP may not bring any claim, action, or proceeding against the TPA in connection with the services provided by the TPA pursuant to the terms of this Consent Order.

80.     FIP may not take any action to collect any amounts beyond the lump sum amounts set forth in the agreements with New York pensioners.

81.     FIP represent and warrant, through the signature below, that the terms and conditions of this Consent Order are duly approved, and execution of this Consent Order is duly authorized.

### Breach of the consent order

82.     In the event that the Department believes FIP to be materially in breach of the Consent Order ("Breach"), DFS will provide written notice to FIP of the Breach and FIP must, within ten business days from the date of receipt of said notice, or on a later date if so determined in the sole discretion of the Department, appear before DFS and shall have an opportunity to rebut the evidence, if any, of DFS that a Breach has occurred and, to the extent pertinent, to demonstrate that any such Breach is not material or has been cured.

83.     The Department and FIP understand and agree that FIP's failure to appear before DFS to make the required demonstration within the specified period as set forth in paragraph 82 is presumptive evidence of FIP's material Breach. Upon a finding of material Breach, DFS has

19

EXHIBIT 4
139

all the remedies available to it under the New York Banking, Financial Services, or other applicable laws and may use any and all evidence available to DFS, for all ensuing hearings, notices, orders, and other remedies that may be available under the New York Banking, Financial Services, or other applicable laws.

### Other provisions

84.     If FIP defaults on any of its obligations under this Consent Order, DFS may terminate this Consent Order, at its sole discretion, upon ten days' written notice to FIP, assuming that FIP does not cure within the above-stated cure period.  In the event of such termination, FIP expressly agrees and acknowledges that this Consent Order shall in no way bar or otherwise preclude DFS from commencing, conducting, or prosecuting any investigation, action, or proceeding, however denominated, related to the Consent Order, against them, or from using in any way statements, documents, or other materials produced or provided by FIP prior to or after the date of this Consent Order, including, without limitation, such statements, documents, or other materials, if any, provided for purposes of settlement negotiations.

85.     In the event that the Consent Order is terminated, the provisions of paragraphs 48, 50, and 80 shall survive such termination.

86.     DFS has agreed to the terms of this Consent Order based on, among other things, the representations made to DFS by FIP, whether directly or through counsel, and DFS's own factual Investigation.  To the extent that representations made by FIP, whether directly or through counsel, is later found to be materially incomplete or inaccurate, this Consent Order or certain provisions thereof are voidable by DFS in its sole discretion.

87.     All notices, reports, requests, certifications, and other communications to any party pursuant to this Consent Order shall be in writing and shall be directed as follows:

If to DFS:

EXHIBIT 4
140

New York Department of Financial Services
One State Street
New York, New York 10004-1511
Attention: Anna MacCormack, Assistant Counsel

FFCPD_Enforcement@dfs.ny.gov

If to FIP:

Future Income Payments, LLC
18300 Von Karman Avenue Suite 410
Irvine, California 92612
Attention: Scott Kohn

with a copy to:

Debevoise & Plimpton LLP
919 Third Avenue
New York, New York 10022
Attn: Eric R. Dinallo, Esq.

and

Womble Carlyle Sandridge & Rice, LLP
555 Fayetteville St.
Suite 1100
Raleigh, North Carolina 27601
Attn: Christopher W. Jones, Esq.

88.     This Consent Order and any dispute thereunder shall be governed by the laws of the State of New York without regard to any conflicts of laws principles.

89.     FIP and Scott Kohn waive their right to further notice and hearing in this matter as to any allegations of past violations up to and including the Effective Date and agree that no provision of the Consent Order is subject to review in any court or tribunal outside the Department.

90.     Scott Kohn, as Owner and President of FIP, is a signatory to this Consent Order and is jointly and severally responsible for all of the obligations set forth herein, both monetary

21

EXHIBIT 4
141

and injunctive, regardless of whether or not Scott Kohn or Owner is named in the specific provision with FIP, and has the same rights as FIP as set forth in this Consent Order.

91.     This Consent Order may not be amended except by an instrument in writing signed on behalf of all the parties to this Consent Order.

92.     This Consent Order constitutes the entire agreement between DFS, FIP, and its Owner and supersedes any prior communication, understanding, or agreement, whether written or oral, concerning the subject matter of this Consent Order. No inducement, promise, understanding, condition, or warranty not set forth in this Consent Order has been relied upon by any party to this Consent Order.

93.     In the event that one or more provisions contained in this Consent Order shall for any reason be held invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions of this Consent Order.

94.     Upon execution by the parties to this Consent Order, DFS will discontinue the Investigation as and against FIP solely with respect to FIP's agreements with New York pensioners. No further action will be taken by DFS against FIP or its Owner, subsidiaries, affiliates, successors, assigns, agents, representatives, employees, or subcontractors for the conduct set forth in the Consent Order provided that FIP complies fully with the terms of the Consent Order.

95.     This Consent Order may be executed in one or more counterparts, and shall become effective when such counterparts have been signed by each of the parties hereto and So Ordered by the Superintendent of Financial Services or her designee ("Effective Date").

EXHIBIT 4
142

WHEREFORE, the signatures evidencing assent to this Consent Order have been affixed

hereto on the dates set forth below.

NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES

By: _____

Joy Feigenbaum
Executive Deputy Superintendent
Financial Frauds and Consumer Protection

October 20, 2016

FUTURE INCOME PAYMENTS, LLC

By: _____

Scott Kohn, in his capacity as: President

October 18, 2016

SCOTT KOHN, as Owner and officer of Future Income Payments, LLC

By: _____

Scott Kohn

October 18, 2016

THE FOREGOING IS HEREBY APPROVED.
IT IS SO ORDERED.

Dated:  New York, New York
        October 20, 2016

_____

MARIA T. VULLO
Superintendent of Financial Services

23

EXHIBIT 4
143