JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU, | CASE NO. 8:17-cv-00303-JLS-SS |
| Petitioner, | **ORDER (1) GRANTING THE CONSUMER FINANCIAL PROTECTION BUREAU'S PETITION TO ENFORCE CIVIL INVESTIGATIVE DEMAND AND (2) DENYING FUTURE INCOME PAYMENTS' MOTION TO STAY CASE (Docs. 1, 27)** |
| vs. | |
| FUTURE INCOME PAYMENTS, LLC, | |
| Respondent. | |

1    Before the Court is the Consumer Financial Protection Bureau's (CFPB) Petition to
2    Enforce Civil Investigative Demand.  (Pet., Doc. 1.)  Respondent Future Income Payments,
3    LLC filed an Opposition (Opp'n, Doc. 26), and the CFPB replied (Reply, Doc. 28).  Also
4    before the Court is Future Income Payments' Motion to Stay Case.  (Mot., Doc. 27; Opp'n,
5    Doc. 39; Reply, Doc. 44.)  For the following reasons, the Court GRANTS the CFPB's
6    Petition and DENIES Future Income Payments' Motion to Stay Case.

7    **I.      BACKGROUND**

8    In the past few years, the income stream market has come under sharp scrutiny for
9    allegedly marketing loans at undisclosed, exorbitant interest rates to vulnerable
10   populations, including veterans and the elderly.  *See John Doe Co. v. CFPB*, 849 F.3d
11   1129, 1130 (D.C. Cir. 2017); U.S. Gov't Accountability Off., GAO-14-420, Pension
12   Advance Transactions: Questionable Business Practices Identified (2014),
13   http://www.gao.gov/assets/670/663800.pdf.  Like several other purchasers and sellers of
14   income streams, Future Income Payments has been the subject of investigations by state
15   regulators in New York, California, Massachusetts, Iowa, Washington, and North
16   Carolina.  (*See* N.Y. Consent Order, Exh. 4, Doc. 29-4; C.A. Stip. Desist and Refrain
17   Order, Exh. 5, Doc. 29-5; C.A. Desist and Refrain Order, Doc. 29-6; Mass. Press Release,
18   Exh. 7, Doc. 29-7; Iowa Assurance of Voluntary Compliance, Exh. 8, Doc. 29-8; Wash.
19   Consent Order, Exh. 9, Doc. 29-9; N.C. Settlement Agreement, Exh. 10, Doc. 29-10.)  In
20   February 2017, the City of Los Angeles filed suit against Future Income Payments,
21   alleging that the company charges usurious, hidden interest rates as high as ninety-six
22   percent, prohibits early termination of the loans (thereby ensuring that consumers cannot
23   avoid the high interest rates), and employs abusive collection practices.  (City of Los
24   Angeles Compl. ¶¶ 2-4, Exh. 11, Doc. 29-11.)

25   On November 23, 2016, the CFPB served this Civil Investigative Demand on
26   Future Income Payments, demanding information related to the company's income-
27   stream-advance transactions.  (*See* CID at 2-5, Exh. A, Doc. 5.)  The CFPB explained
28   that the purpose of its investigation was:

1  to determine whether financial-services companies or other persons have

2  engaged or are engaging in unlawful acts and practices in connection with

3  offering or providing extensions of credit or financial advisory services

4  related to transactions involving pensions, annuities, settlements, or other

5  future-income streams in violation of §§ 1031 and 1036 of the Consumer

6  Financial Protection Act of 2010, 12 U.S.C. §§ 5531, 5536, or any other

7  Federal consumer-financial law. The purpose of this investigation is also to

8  determine whether Bureau action to obtain legal or equitable relief would be

9  in the public interest.

10  (CID at 1, Exh. A.)  The CFPB's nine interrogatories, two requests for written reports, and

11  ten requests for documents seek information regarding Future Income Payments' structure,

12  investors, marketing, business relationships, bank accounts, collection efforts, financial

13  records, involvement in other government investigations, and income-stream-advance

14  transactions.  (*See id.* at 2-5.)

15        Future Income Payments submitted a petition to set aside the CID on December 13,

16  2016, which the CFPB denied on January 5, 2017.  (Hartmann Decl. ¶¶ 5-6, Doc. 4.)  Four

17  days later, Future Income Payments filed suit in the United States District Court for the

18  District of Columbia to enjoin the CFPB from taking any adverse action against it and to

19  allow the company to proceed anonymously.  (*Id.* ¶ 10.)  The district court denied Future

20  Income Payments' request to prohibit the CFPB from taking any action against the

21  company but enjoined the agency from naming it in any public filing until March 3, 2017.

22  (Order, Exh. A, Doc. 4.)  On March 3, the D.C. Circuit denied Future Income Payment's

23  request for an emergency stay pending appeal.  *See John Doe Co.*, 849 F.3d 1129.

24        The CFPB filed this Petition to Enforce the Civil Investigative Demand under seal on

25  February 21, 2017.  (Pet.)  After the district court's injunction lapsed in *John Doe Co.*, the

26  Court unsealed this action and issued a revised briefing schedule.  (Order, Doc. 21.)

27

28

1    **II.    DISCUSSION**

2    To determine whether to enforce an administrative subpoena, a court considers "[1]

3    whether Congress has granted the authority to investigate; [2] whether procedural

4    requirements have been followed; and [3] whether the evidence is relevant and material to

5    the investigation." *EEOC v. Children's Hosp. Med. Ctr. of N. Cal.*, 719 F.2d 1426, 1428

6    (9th Cir. 1983) (en banc), *overruled on other grounds as recognized in Prudential Ins. Co.*

7    *v. Lai*, 42 F.3d 1299, 1303 (9th Cir. 1994). If the agency has satisfied these prerequisites,

8    "the subpoena should be enforced unless the party being investigated proves the inquiry is

9    unreasonable because it is overbroad or unduly burdensome." *Children's Hosp. Med. Ctr.*

10    *of N. Cal.*, 719 F.2d at 1428. A subpoenaed party is also free to raise any constitutional

11    challenges to the CFPB's authority to issue a CID, which this Court reviews on a plenary

12    basis. 12 U.S.C. §§ 5562(e), (h)(1); *John Doe Co.*, 849 F.3d at 1131.

13    Future Income Payments contends that the CID should not be enforced because (1)

14    the CFPB is structurally unconstitutional, (2) the CID seeks information outside of the

15    CFPB's jurisdiction, and (3) the CID is overbroad. (*See generally* Opp'n.) Under the

16    doctrine of constitutional avoidance, the Court first considers whether Future Income

17    Payments' statutory arguments have merit before turning to its constitutional challenge.

18    **A.    CFPB's Jurisdiction**

19    A party cannot defeat enforcement of an administrative subpoena by raising fact-

20    bound challenges related to "coverage or compliance with the law." *EEOC v. Karuk Tribe*

21    *Hous. Auth.*, 260 F.3d 1071, 1076 (9th Cir. 2001); *see also Endicott Johnson Corp. v.*

22    *Perkins*, 317 U.S. 501, 508-09 (1943). This Circuit has recognized a narrow exception to

23    this rule for "jurisdictional" challenges, but even then a court's inquiry focuses solely on

24    whether "there is some 'plausible' ground for jurisdiction." *Karuk Tribe Hous. Auth.*, 260

25    F.3d at 1077 (citation omitted). In other words, as long as the agency's jurisdiction is not

26    "plainly lacking," a court should enforce an administrative subpoena, even if the

27    respondent raises a reasonable argument that the subpoena is beyond an agency's statutory

28    mandate. *Id.*; *see also CFPB v. Great Plains Lending, LLC*, 846 F.3d 1049, 1051, 1058

4

(9th Cir. 2017) (applying the "plainly lacking" standard to a CID issued by the CFPB). The "plainly lacking" standard is necessarily a low bar to avoid tasking courts and parties with resolving complex hypotheticals before an agency even decides whether to take an enforcement action.

Much of the Ninth Circuit's jurisprudence applying this "jurisdictional" exception involves Native American tribes' challenges to whether they should be considered "persons" under various statutes. *See, e.g.*, *Great Plains Lending, LLC*, 846 F.3d at 1053 (whether a tribe is a "person" under the Consumer Financial Protection Act); *NLRB v. Chapa De Indian Health Program, Inc.*, 316 F.3d 995, 998 (9th Cir. 2003) (National Labor Relations Act); *Karuk Tribe Hous. Auth.*, 260 F.3d at 1077 (Occupational Safety and Health Act). In *Karuk Tribe Housing Authority*, the Ninth Circuit concluded that a Native American tribe's challenge to the EEOC's authority was jurisdictional and the agency's authority was plainly lacking. *Id.* at 1077-78, 1083. *Karuk Tribe Housing Authority* contrasted the tribe's argument that the Age Discrimination in Employment Act simply did not apply to tribal governments with other cases where "the subpoenaed parties could, *under some set of facts*, be found in violation of federal law . . . ." *Id.* at 1078 (emphasis added). By contrast, in *Children's Hospital Medical Center of Northern California*, the Ninth Circuit sitting *en banc* held that a *res judicata* defense did not warrant denying enforcement of an administrative subpoena. 719 F.2d at 1427-30. Although the subpoenaed party's *res judicata* argument raised "an important[] and . . . difficult question . . . worthy of serious consideration," a party cannot avoid complying with an administrative subpoena based on "what normally would be a defense to an action by the agency." *Id.* at 1427. Even if the *res judicata* defense could be construed as jurisdictional, the *en banc* court noted that the EEOC's jurisdiction was not "plainly lacking," considering how unsettled the law was regarding the preclusive effects of prior class actions on subsequent class claims. *Id.* at 1430.

Future Income Payments posits that the CFPB lacks jurisdiction because the company's future-income streams are not a consumer financial product or service. (Opp'n

5

1    at 17-18.)  Although couched as a challenge to the CFPB's jurisdiction, this argument

2    really invites a fact-intensive inquiry into whether the company's products qualify as loans

3    under the Truth in Lending Act.  Because Future Income Payment's challenge concerns the

4    "coverage" of the applicable consumer financial statutes and the company's compliance

5    with the law, it cannot raise this issue to prevent enforcement of the CFPB's administrative

6    subpoena.  *See Children's Hosp. Med. Ctr. of N. Cal.*, 719 F.2d at 1429; *Endicott Johnson*

7    *Corp.*, 317 U.S. at 508-09.  Even assuming *arguendo* that Future Income Payments'

8    challenge implicates the CFPB's jurisdiction, the two unpublished district court decisions

9    that the company relies on hardly establish that the agency's jurisdiction in "plainly

10   lacking."  (*See* Opp'n at 18 (citing *Capela v. J.G. Wentworth, LLC*, No. CV09-882

11   SJF/WDW, 2009 WL 3128003, at *9-10 (E.D.N.Y. Sept. 24, 2009); *Reed v. Val-Chris*

12   *Investments, Inc.*, No. 11CV371 BEN WMC, 2011 WL 6028001, at *2-3 (S.D. Cal. Dec.

13   5, 2011).)  Not only do those cases involve different transactions (specifically, a certain

14   structured settlement and an assignment), but at least six state regulators and the City of

15   Los Angeles have found that Future Income Payments' products *do* constitute loans.  (*See*

16   *generally* N.Y. Consent Order, Exh. 4, Doc. 29-4; Stip. Desist and Refrain Order, Exh. 5,

17   Doc. 29-5; C.A. Desist and Refrain Order, Doc. 29-6; Mass. Press Release, Exh. 7, Doc.

18   29-7; Iowa Assurance of Voluntary Compliance, Exh. 8, Doc. 29-8; Wash. Consent Order,

19   Exh. 9, Doc. 29-9; N.C. Settlement Agreement, Doc. 29-10; City of Los Angeles Compl.,

20   Exh. 11, Doc. 29-11.)  Suffice to say, the CFPB has "some 'plausible' ground for

21   jurisdiction" over Future Income Payments' income-stream-advance transactions.  *See*

22   *Karuk Tribe Hous. Auth.*, 260 F.3d at 1077 (citation omitted).

23   **B.    Scope of the CID**

24   Future Income Payments next argues that the CID seeks information outside Future

25   Income Payments' possession, custody, or control; is temporally overbroad; seeks

26   irrelevant information; and imposes an undue burden on the company.  (*See* Opp'n at 19-

27   25.)  None of these arguments are persuasive.

28

### 1. Possession, Custody, or Control

Relying on the CID's definition of "Company," "you," and "your" and its definition of "affiliate," Future Income Payments contends that the CID "is overly broad to the extent it seeks documents from other companies who may share a common owner with FIP, but have no relation whatsoever to the stated purpose in the CID."  (Opp'n at 20-22.)

The CID defines "Company," "you," and "your" as:

> Future Income Payments, LLC, formerly known as Pensions, Annuities and Settlements, LLC, any successor in interest, and any parent companies, wholly or partially owned subsidiaries, unincorporated divisions, joint ventures, operations under assumed names, and affiliates, and all principals, directors, officers, owners, employees, agents, representatives, consultants, attorneys, accountants, independent contractors, and other persons working for or on behalf of the foregoing.

(CID Def. E, Exh. A.)  Read purely in isolation, this definition could conceivably be construed to request information outside of Future Income Payments' possession, custody, or control.  But Instruction I clarifies that "[t]his CID covers materials and information *in your possession, custody, or control,* including but not limited to documents in the possession, custody, or control of your attorneys, accountants, other agents or consultants, directors, officers and employees."  (CID Inst. I, Exh. A. (emphasis added).)  In keeping with traditional principles of agency law, a principal-agent relationship or a contractual right is sufficient to establish "control."  *See, e.g.*, *St. Jude Med. S.C., Inc. v. Janssen-Counotte*, 104 F. Supp. 3d 1150, 1159 (D. Or. 2015); *Allen v. Woodford*, No. CVF051104OWWLJO, 2007 WL 309945, at *2 (E.D. Cal. Jan. 30, 2007); *Rosie D. v. Romney*, 256 F. Supp. 2d 115, 119 (D. Mass. 2003); *see also* Restatement (Third) of Agency § 8.11 (2006) ("An agent has a duty to use reasonable effort to provide the principal with facts that the agent knows, has reason to know, or should know when . . . subject to any manifestation by the principal, the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to

7

1   the principal . . . ."). Thus, properly construed, the CID does not seek—nor will this Court

2   require—Future Income Payments to produce documents outside its possession, custody,

3   or control.

4          Conversely, as long as the information that the CFPB seeks is responsive and within

5   Future Income Payments' possession, custody, or control it is properly within the scope of

6   the CID. As the CFPB notes, Future Income Payments may operate through a complex

7   web of legal entities. (Reply at 19-20.) A consent decree Future Income Payments entered

8   with the New York State Department of Financial Services in October 2016 reveals that

9   Future Income Payments has at least three marketing affiliates—Cash Flow Investment

10  Partners, LLC, BuySellAnnuity, Inc., and Pension Advance, LLC—that operate out of the

11  company's address in Irvine, California. (N.Y. Consent Order at 2-3, Exh. 4.) The CFPB

12  also points to the City of Los Angeles' contention that Future Income Payments' owner

13  and manager, Scott Kohn, "operate[s] his pension loan and investment scheme" through a

14  "web of entities," including Future Income Payments, LLC; BuySell Annuity, Inc.; Cash

15  Flow Investment Partners, LLC (a Delaware LLC); Cash Flow Investment Partners LLC (a

16  California LLC); Pension Advance LLC; PAS California, LLC; and London Square

17  Specialty Services, LLC. (Reply at 19; City of Los Angeles Compl. ¶¶ 7-9, Exh. 11.) The

18  CFPB convincingly argues that, to avoid Future Income Payments potentially evading

19  compliance with the CID through this network of legal entities, the administrative

20  subpoena must sweep broadly to include information held by the persons and entities

21  identified in the CID's definition of "Company," "you," or "your," insofar as that

22  information is within Future Income Payments' possession, custody, or control. (Reply at

23  19-20.)

24         Future Income Payments arguments to the contrary are unavailing. The company

25  does not identify a single legal entity that would be subject to the CID that does not have

26  information relevant "to the stated purpose of the CID." (*See* Opp'n at 20.) And limiting

27  the scope of the CID, as Future Income Payments proposes, to "FIP and any of its

28  predecessors and successors, relating to lending or financial advisory services involving

the purchase of future income streams" (*see* Opp'n at 17-18) would potentially result in the company producing nothing because it claims that it does not offer any consumer financial products or services.

### 2. Temporal Scope of the CID

Future Income Payments claims that the CID is temporally overbroad because the "Applicable Period for Responsive Materials" extends from "December 1, 2011 until the date of full and complete compliance with this CID." (CID Inst. C, Exh. A.) The applicable period, the company argues, should be narrowed to December 1, 2013 to align with the applicable statute of limitations.

Future Income Payments' argument is incorrect in two respects. First, the statute of limitations provided in 12 U.S.C. § 5564 commences upon "the date of discovery of the violation to which an action relates." 12 U.S.C. § 5564(g). So, even if this statute of limitations would apply to an enforcement action taken by CPFB (and not all enforcement actions are subject to this limitations period), Future Income Payments' argument assumes that the CFPB knew all along of the company's potential violations of the consumer financial protection laws. Second, the standard for determining whether the temporal scope of a CID is proper "is whether such information is relevant to conduct for which liability can be imposed." *CFPB v. Harbour Portfolio Advisors, LLC*, No. 16-14183, 2017 WL 631914, at *5 (E.D. Mich. Feb. 16, 2017); *see also NLRB v. Line*, 50 F.3d 311, 314-15 (5th Cir. 1995) (affirming enforcement of an administrative subpoena extending five years back when the applicable statute of limitations was six months); *F.T.C. v. Texaco, Inc.*, 555 F.2d 862, 882 (D.C. Cir. 1977). Thus, even assuming that the only actionable conduct occurred within the past three years, the CFPB may properly demand information for an additional two years because this information is reasonably relevant to conduct occurring within the statute of limitations period. *See Line*, 50 F.3d at 314-15.

### 3. Relevance of the Information Sought

Future Income Payments also contends that the CID seeks irrelevant information. (Opp'n at 23-24.) The only examples the company identifies, however, are Interrogatory

No. 5 and Request for Written Report No. 1.  (*See id.*)  These requests seek Future Income Payments' financial data "relating to income-stream-advance transactions" and bank accounts "held in the name of or for the benefit of the Company."  (CID Rpt. 1, Exh. A, Intrg. 5, Exh. A.)  Contrary to Future Income Payments' argument, the company's gross revenue, expenses, and net profit from income-stream-advance transactions are highly relevant to whether it or other entities have engaged in illegal practices "related to transactions involving pensions, annuities, settlements or other future-income streams" and whether an enforcement action "would be in the public interest."  (CID at 1, Exh. A.)  In determining whether to take an enforcement action, an agency may consider the scale of the potential violations and the defendant's profit from these actions.  Likewise, Future Income Payments' bank information will help the CFPB determine whether the company uses a complex web of legal entities to operate.

### 4.  Undue Burden

Finally, Future Income Payments asserts that complying with the CID would impose an undue, or "extreme" burden on the company.  (Opp'n at 24-25.)  The company may have waived this argument by failing to raise it during the administrative meet-and-confer process or in its administrative appeal.  *See N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1081 (9th Cir. 2011) ("A party waives arguments that are not raised during the administrative process."); *see also* 12 C.F.R. § 1080.6(c)(3).  But even considering the argument on its merits, Future Income Payments has failed to demonstrate that the CID "is overbroad or unduly burdensome."  *See Children's Hosp. Med. Ctr. of N. Cal.*, 719 F.2d at 1428 (noting that the party opposing enforcement bears the burden of showing that compliance would impose an undue burden).  To show that an administrative subpoena imposes an undue burden, a subpoenaed party cannot merely point to an agency's "extensive" requests or assert that compliance would be costly.  *See, e.g.*, *FDIC v. Garner*, 126 F.3d 1138, 1145-46 (9th Cir. 1997); *NLRB v. Vista Del Sol Health Servs.*, Inc., 40 F. Supp. 3d 1238, 1265-66 (C.D. Cal. 2014); *CFTC v. Ekasala*, 62 F. Supp. 3d 88, 94 (D.D.C. 2014).  Instead, the party opposing enforcement must supply evidence

1  establishing that compliance "threatens to unduly disrupt or seriously hinder normal

2  operations of a business." *Texaco*, 555 F.2d at 882; *see Ekasala*, 62 F. Supp. 3d at 94

3  ("The standard for showing that a request is unduly burdensome . . . is a high one.").

4        The only concrete example Future Income Payments provides to support its undue

5  burden argument is that the agency seeks "all" of certain types of documents, such as its

6  agreements with consumers.  (Opp'n at 24-25.)  These requests, Future Income Payments

7  contends, should be limited to "'documents sufficient to show' a particular practice."

8  (Opp'n at 24.)  But crucially absent from Future Income Payment's Opposition is any

9  evidence showing that the administrative subpoena imposes an undue burden, such as a

10  declaration specifying the estimated cost of compliance, the effect of compliance on Future

11  Income Payments' operations, the number of responsive documents, or some other

12  indication of the burden of complying.  Future Income Payments' bald assertions that

13  compliance would result in "significant business consequences" do not establish an undue

14  burden.  (*See* Opp'n at 24-25.)  Besides, the CFPB's requests are proportionate to the

15  potential scale of the violations at issue in this investigation.  *See Garner*, 126 F.3d at

16  1146.

17        In sum, the CFPB's CID is appropriate in scope and duration, seeks only relevant

18  information, and does not impose an undue burden on Future Income Payments.

19        **C.**     **CFPB's Constitutionality**

20        Because none of Future Income Payments' other arguments have merit, the Court

21  must turn to the company's constitutional challenges.  For the following reasons, the Court

22  finds that the CFPB Director's for-cause protection from removal is constitutional, and,

23  even if the agency were unconstitutionally structured, the enforcement of a subpoena

24  issued by the agency would not be unconstitutional.

25        **1.  The CFPB's For-Cause Removal Protection Does Not Violate the**

26                **Constitution.**

27        The Take Care Clause provides that the President "shall take Care that the Laws be

28  faithfully executed . . . ."  U.S. Const. art. II, § 3.  The Supreme Court has construed this

1    "simple but delphic" provision, along with the Vesting and Appointments Clauses, as

2    circumscribing Congress's ability to impose restrictions on the President's authority to

3    remove executive officials.  Jack Goldsmith & John F. Manning, *The Protean Take Care*

4    *Clause*, 164 U. Pa. L. Rev. 1835, 1836-37 (2016).

5         In *Myers v. United States*, the Supreme Court held that a statute barring the

6    President from removing the Postmaster General unless the President secured the advice

7    and consent of the Senate impermissibly usurped the President's executive authority.  272

8    U.S. 52, 107, 176 (1926).  *Myers*'s seemingly expansive holding, however, was

9    substantially narrowed less than ten years later in *Humphrey's Executor v. United States*,

10   295 U.S. 602 (1935).  There, the Court affirmed the constitutionality of the Federal Trade

11   Commission Act's for-cause removal provision, which provided that the President could

12   remove FTC commissioners only "for inefficiency, neglect of duty, or malfeasance in

13   office."  *Id.* at 620.  The President, the Court held, has no "illimitable power" to remove

14   officers charged with running "quasi legislative or quasi judicial agencies."  *Id.* at 629.  To

15   the contrary, Congress may require these administrative agencies "to act in discharge of

16   their duties independently of executive control," and "that authority includes, as an

17   appropriate incident, power to fix the period during which they shall continue, and to

18   forbid their removal except for cause in the meantime."  *Id.*

19        Though *Humphrey's Executor* distinguished *Myers* as addressing a "purely

20   executive" office, the Supreme Court has since recognized that the inquiry cannot be

21   reduced to whether the role is "purely executive" or holds some "quasi-judicial" or "quasi-

22   legislative" characteristics.  *Morrison v. Olson*, 487 U.S. 654, 689 (1988).  As the Supreme

23   Court has observed, the "the powers of the FTC at the time of *Humphrey's Executor* would

24   at the present time be considered 'executive,' at least to some degree," and many

25   government functions cannot be neatly classified as "quasi-legislative" or "purely

26   executive."  *Id.* at 689 n.28.  The guiding question instead is whether an officer's for-cause

27   removal protection "interfere[s] with the President's exercise of the 'executive power' and

28   his constitutionally appointed duty to 'take care that the laws be faithfully executed' under

1   Article II."  *Id.* at 690.  Thus, Congress can establish, for instance, an independent

2   prosecutor who can be removed only for "good cause."  *Id.* at 692-93.  But Congress

3   cannot insulate officers behind two levels of for-cause protection from removal because

4   such a "diffusion of accountability" unduly interferes with "the President's 'constitutional

5   obligation to ensure the faithful execution of the laws.'"  *Free Enter. Fund v. Pub. Co.*

6   *Accounting Oversight Bd.*, 561 U.S. 477, 484, 497 (2010) (quoting *Morrison*, 487 U.S. at

7   693).

8          The CFPB executes essentially the same responsibilities that the FTC did at the

9   time of *Humphrey's Executor*.  Like the FTC in 1935, the CFPB has the power to conduct

10  administrative adjudications, bring civil enforcement proceedings, promulgate regulations,

11  conduct public investigations, and issue reports on its findings.  *Compare* 12 U.S.C. §§

12  5511-12, 5532, 5534, 5562-64 *with* Federal Trade Commission Act, H.R. 15613, 63d

13  Cong, 38 Stat. 717 §§ 5-6, 9-10 (1914).  The CFPB is headed by a Director, who serves a

14  five-year term upon appointment by the President and confirmation by the Senate.  12

15  U.S.C. §§ 5491(b)(1), (2).  The CFPB's Director may be removed only for "inefficiency,

16  neglect of duty, or malfeasance in office," *id.* § 5491(c)(3), the same degree of protection

17  afforded to FTC commissioners.

18         In *CFPB v. Morgan Drexen, Inc.*, this Court held that the CFPB Director's for-

19  cause removal protection "when considered as a part of the CFPB's overall structure and

20  mission, does not impermissibly interfere with the President's power to assure that the

21  laws be faithfully executed."  60 F. Supp. 3d 1082, 1088 (C.D. Cal. 2014).  The CFPB's

22  authority closely parallels the FTC's powers considered in *Humphrey's Executor*. That the

23  FTC was (and still is) run by a five-member commission, while the CFPB has a director

24  makes no constitutional difference.  *Id.* at 1087-88.  *Humphrey's Executor* did not

25  distinguish *Myers* based on the agencies' different leadership structure—and with good

26  reason: To revamp a five-member board like the FTC, the President "would have been

27  required to affect five separate for cause removals, while only one is required in order to

28  change the leadership of the CFPB."  *Id.* at 1088.  Further, compared to the CFPB

Director's five-year term, the President's authority over the FTC is more circumscribed because its commissioners serve staggered, seven-year terms. *Id.* at 1088 n.3. Thus, if the proper inquiry is whether the for-cause removal protection afforded to the CFPB Director interferes with the President's duty "to take care that the laws are faithfully executed," *Morrison*, 487 U.S. at 690, the CFPB's structure is at least as constitutionally sound as the FTC. *Morgan Drexen*, 60 F. Supp. 3d at 1088. And, in any event, there is no textual basis in the Constitution for concluding that independent agencies must be led by multimember commissions. *See id.* at 1092.

Future Income Payments argues that this Court's decision in *Morgan Drexen* deserves reconsideration because "courts . . . have agreed since October 2016 that the Bureau is structurally unconstitutional." (Opp'n. at 8 (capitalization removed).) What Future Income Payments portrays as a wall of precedent is a vacated 2-1 decision, *PHH Corp. v. CFPB*, 839 F.3d 1 (D.C. Cir. 2016), *reh'g en banc granted, order vacated* (Feb. 16, 2017), and a district court decision following *PHH Corp.*, *see CFPB v. Fomichev*, No. 2:16-cv-2724 (C.D. Cal. Nov. 17, 2016) (Doc. 40).

As an initial matter, the *PHH* majority acknowledged that "there is no meaningful difference in responsiveness and accountability to the President" between an agency headed by a commission and a director. 839 F.3d at 32. That is enough to end the inquiry. Under the Supreme Court's precedent, a for-cause removal provision does not offend the Constitution unless it "interfere[s] with the President's exercise of the 'executive power' and his constitutionally appointed duty to 'take care that the laws be faithfully executed' under Article II." *Morrison*, 487 U.S. at 690. *PHH* omits any reference to this holding from *Morrison*, relies heavily on the dissent in that decision, and quotes law review articles calling *Humphrey's Executor* "egregious" and "[r]emarkabl[e]." 839 F.3d at 34 n.15. The Supreme Court's decisions, however, "remain binding precedent until [it] see[s] fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (quoting *Hohn v. United States*, 524 U.S. 236, 253 (1998)).

In *PHH*, the panel majority declared the CFPB Director's for-cause removal protection unconstitutional based on two propositions: First, that the purported lack of historical precedent for the CFPB directorship's for-cause protection from removal doomed its constitutionality, and, second, that "multi-member independent agencies are superior to single-Director independent agencies in preventing arbitrary decisionmaking and abuse of power, and thereby protecting individual liberty." *See* 839 F.3d at 21-30. Neither is persuasive.

There are at least three other active government agencies that share the CFPB's structure: the Social Security Administration, the Office of Special Counsel, and the Federal Housing Financial Agency (which oversees Fannie Mae, Freddie Mac, and eleven Federal Home Loan Banks).  *See* 5 U.S.C. § 1211(b) (Office of Special Counsel); 12 U.S.C. § 4512(b)(2) (Federal Housing Finance Agency); 42 U.S.C. § 902(a)(3) (Social Security Administration).  A fourth director-led agency, the Office of the Comptroller of the Currency, likely enjoys for-cause protection from removal as well.  12 U.S.C. § 2 (requiring the President to "communicate[]" "reasons" for removal of the Comptroller to the Senate); 44 U.S.C. § 3502(5) (including the Office of the Comptroller of the Currency among the agencies listed in the definition of an "independent regulatory agency").  More fundamentally, the distinction *PHH* drew between multimember boards and directors is overly simplistic: Many independent agencies headed by multimember bodies have "chairs" that, by statute or practice, wield substantial control over the agency's decisionmaking.  *See* Marshall J. Breger & Gary J. Edles, *Established by Practice: The Theory and Operation of Independent Federal Agencies*, 52 Admin. L. Rev. 1111, 1177-78 (2000) (concluding that in some independent agencies headed by multimember boards, "the combination of political prestige and managerial authority accord . . . agency chairmen the power to dominate and control their agencies' agendas").  For instance, though the Federal Reserve has a Board of Governors, the Federal Reserve Chair wields considerable influence over rate-making and bank oversight, such that her statements can move markets.  *See* Tony Caporale & Kevin B. Grier, *A Political Model of Monetary*

1    *Policy with Application to the Real Fed Funds Rate*, 41 J.L. & Econ. 409, 422-23 (1998)

2    (observing that empirical evidence shows that "changes in the identity of the Fed chair

3    significantly change monetary policy").

4         *PHH* attempted to distinguish the Social Security Administration as a direct

5    analogue by observing that the agency lacked "law enforcement" authority.  839 F.3d at

6    19.  Yet *PHH* does not explain why the CFPB's civil enforcement authority implicates

7    "the core of the executive power" any more than the Social Security Administration's

8    power to determine benefits for millions.  *See id.*  Staffed with more than 65,000 federal

9    employees and responsible for a budget of over 1 *trillion* dollars, the Social Security

10   Administration handles "5.7 million retirement, survivors, and Medicare claims; over 2.8

11   million Social Security and SSI initial disability claims; and nearly 216,000 SSI aged

12   claims."  *See* Social Security Admin., FY 2017 Budget Overview 1, 3 (2016)

13   https://www.ssa.gov/budget/FY17Files/2017BO.pdf.  As *Morrison* observed, the difficulty

14   with identifying "core" executive functions is that the same duties may seem "executive"

15   in certain circumstances and "legislative" or "judicial" in others.  *See* 487 U.S. at 689 n.28

16   (noting the tension in what duties *Bowsher v. Synar*, *Buckley v. Valeo*, and *Humphrey's*

17   *Executor* characterized as "judicial," "legislative," "executive," or "administrative").

18        Even if there were no direct precedent to the CFPB, "[o]ur constitutional principles

19   of separated powers are not violated . . . by mere anomaly or innovation."  *Mistretta v.*

20   *United States*, 488 U.S. 361, 385 (1989).  To state an obvious but important point,

21   "[e]verything is new the first time it is enacted, and many different kinds of laws are not

22   similar to laws that were enacted in the first several sessions of Congress."  Leah M.

23   Litman, *Debunking Anti-Novelty*, 66 Duke L. Rev. 1407, 1459-65 (2017) (cataloguing the

24   ways in which federal institutions have grown more complex or confronted new

25   challenges).  As our economy, society, and scientific knowledge have developed, Congress

26   has endeavored to craft new institutions to tackle the challenges that modern society

27   presents.  If novelty alone were the proper measure of a statute's lawfulness, Congress

28   would be powerless to fashion any modern administrative agency, much less one with the

16

for-cause removal protection sanctioned in *Humphrey's Executor*. *See* William H. Hardie III, Note, *The Independent Agency After Bowsher v. Synar-Alive and Kicking*, 40 Vand. L. Rev. 903, 906–07 (1987) (observing that the Interstate Commerce Commission, created in 1887, represented the first federal agency charged exclusively with regulating a particular industry and, with its combination of rulemaking, adjudicatory, and enforcement authority, became the "model for the modern administrative agency").

Nor is there any guarantee that multimember bodies will better protect individual liberty "by preventing arbitrary decisionmaking and abuse of power." *See PHH*, 839 F.3d at 25-30. Though *PHH* portrays multimember independent agencies as objectively superior to those led by a director, there are many potentially competing trade-offs and no empirical evidence that establishes the superiority of either. In theory, commissions are thought to be more deliberative while director-led organizations are considered more nimble. *See, e.g.*, Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15, 37-38, 71 n.319 (2010). These characteristics do not translate neatly into greater (or lesser) accountability: A commission, for instance, may be less responsive to the Executive or the public due to internal divisions or sheer sluggishness. For the same reason, the effect (if any) of an independent agency's leadership structure on the risk of capture by industry remains unknown. *PHH* also focuses principally on the differences between *independent* commissions and *independent* directorships. If—as *PHH* urges—agencies should be structured to avoid the improper exercise of "law enforcement" authority, many would reason that either an independent commission or an independent directorship would be preferable to an agency fully exposed to political winds. *See, e.g.*, David M. Driesen, *Firing U.S. Attorneys: An Essay*, 60 Admin. L. Rev. 707, 711 (2008).

Moreover, Congress devised many tools, some novel, to ensure the CFPB remains accountable. Unlike other financial regulators, the CFPB undergoes annual audits by the Government Accountability Office, 12 U.S.C. § 5496a, and has a capped budget from the Federal Reserve System, *id.* § 5497. *See* Adam J. Levitin, *The Consumer Financial*

*Protection Bureau: An Introduction*, 32 Rev. Banking & Fin. L. 321, 343 (2013).  Besides

judicial review under the Administrative Procedure Act and the Small Business Regulatory

Enforcement Fairness Act, CFPB's rules may be stayed or overridden by the Financial

Stability Oversight Council, 12 U.S.C. § 5513.  The agency has no authority to bring

criminal prosecutions, *see id.* § 5566, and has only limited authority to represent itself

before the Supreme Court, *id.* § 5564(e).  The CFPB must submit extensive semi-annual

reports to Congress and the President that detail, among other activities, any anticipated

rulemaking or orders.  *Id.* § 5496; *see* Michael S. Barr, Comment, *Accountability and

Independence in Financial Regulation: Checks and Balances, Public Engagement, and

Other Innovations*, 78 Law & Contemp. Probs. 119, 126 (2015) (asserting that the

architects of the CFPB, including the author, created an "extensive array of reporting

requirements [to] . . . force[] the Bureau to demonstrate to Congress on a continuous basis

that it is working to accomplish its mission").  In addition, Congress required the CFPB to

establish a system to provide timely responses "to complaints against, or inquiries

concerning" providers of consumer financial products.  12 U.S.C. § 5534.

At bottom, whether to structure an independent agency as a multimember or

director-led body depends on the proper weighing of the advantages and drawbacks of

each structure.  But neither the text of the Constitution nor any Supreme Court precedent

supports drawing a constitutional distinction between multimember and director-led

independent agencies, so the question is properly reserved for the political branches and

the democratic process.

## 2. Even if the CFPB Director's For-Cause Removal Protection Were Unconstitutional, the CID Should Be Enforced.

Even if the CFPB Director's statutory protection from removal were

unconstitutional under *PHH*'s reasoning, the CFPB's administrative subpoena should

nevertheless be enforced.  For Future Income Payments to defeat enforcement of the CID

based on the agency's structure, the company "would have to show that only the Executive

Branch can demand information from regulated businesses or take such investigative

steps." *John Doe Co.*, 849 F.3d at 1133.  Yet every precedent from the Supreme Court suggests otherwise.  *See id.*  Congress unquestionably has the authority to issue subpoenas. *See, e.g.*, *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 504 (1975).  And in *Buckley v. Valeo*, the Supreme Court, although striking down the process for appointing commissioners to the Federal Election Commission, stressed that "[i]nsofar as the powers confided in the Commission are essentially of an investigative and informative nature, . . . there can be no question that the Commission as presently constituted may exercise them." 424 U.S. 1, 137 (1976).  Indeed, Congress has granted every director-run independent agency the power to issue administrative subpoenas.  *See* 5 U.S.C. § 1212(b)(2) (Office of Special Counsel); 12 U.S.C. § 4641 (Federal Housing Finance Agency); 42 U.S.C. § 405(d) (Social Security Administration); *see also* 12 U.S.C. § 481 (providing that OCC bank examiners "shall have power to make a thorough examination").  A finding that the CFPB cannot exercise the subpoena power would logically preclude these other agencies from exercising their statutory authority as well.  Thus, even if the CFPB Director's for-cause removal protection violates separation-of-powers principles, the agency could still lawfully exercise the subpoena power against Future Income Payments.

### D.  Request for a Stay

Separately, Future Income Payments seeks a stay of this case pending the resolution of the request for an interlocutory appeal in *CFPB v. CashCall* and the *en banc* proceedings in *PHH Corp. v. CFPB*.  (Stay Mot. at 1, Doc. 27.)  After Future Income Payments filed its Motion, the Ninth Circuit denied interlocutory review in *CashCall*. (Ninth Circuit Order, Exh. 4, Doc. 39-5.)  As for staying this case pending the resolution of *PHH Corp.*, the Court finds a stay unwarranted for the reasons identified below.

In determining whether to exercise its inherent authority to stay a case, a court should weigh three salient considerations:

> [1] the possible damage which may result from the granting of a stay, [2] the
> hardship or inequity which a party may suffer in being required to go forward,
> and [3] the orderly course of justice measured in terms of the simplifying or

1    complicating of issues, proof, and questions of law which could be expected

2    to result from a stay.

3  *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962). Under the first factor, "the Court

4  begins with the reasonable assumption that a stay—while not 'invariably improper or

5  inappropriate'—'inherently increases the risk that witnesses' memories will fade and

6  evidence will become stale.'" *Brenner v. Procter & Gamble Co.*, No. SACV 16-1093-JLS-

7  JCGX, 2016 WL 8192946, at *10 (C.D. Cal. Oct. 20, 2016) (quoting *Blue Cross & Blue*

8  *Shield of Alabama v. Unity Outpatient Surgery Ctr., Inc.*, 490 F.3d 718, 724 (9th Cir.

9  2007)). This concern carries particular force when a stay would impede a government

10  investigation. *See John Doe Co. v. CFPB*, No. CV 17-0049 (RC), 2017 WL 663528, at *7

11  (D.D.C. Feb. 17, 2017) (observing that "the public has a strong interest in the vigorous

12  enforcement of consumer protection laws"); *FTC v. Sequoia One, LLC*, No. 2:15-CV-

13  01512-JCM-CWH, 2015 WL 9462082, at *4 (D. Nev. Dec. 23, 2015). Future Income

14  Payments, therefore, bears the burden of demonstrating a "clear case of hardship or

15  inequity" under the other two factors. *Brenner*, 2016 WL 8192946, at *10 (quoting *Landis*

16  *v. N. Am. Co.*, 299 U.S. 248, 255 (1936)).

17        The DC Circuit and a district court have already rejected Future Income Payments'

18  claims that having to participate in a government investigation that the company believes to

19  transgress separation-of-powers principles constitutes irreparable harm. *See John Doe Co.*,

20  849 F.3d at 1135 (rebuffing Future Income Payments' position that "any alleged

21  separation-of-powers injury is by its very nature irreparable"); *John Doe Co.*, 2017 WL

22  663528, at *6 (same). Similarly, in *Tilton v. SEC*, a challenge to the constitutionality of the

23  appointment of administrative law judges in the SEC, the Second Circuit held that "being

24  subjected to an unconstitutional administrative process" and enduring the "expense and

25  disruption" of these proceedings do not qualify as irreparable harm. 824 F.3d 276, 286 (2d

26  Cir. 2016); *see FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980) (holding that the

27  "expense and disruption" of defending oneself in "protracted adjudicatory proceedings" do

28  not amount not irreparable harm). Future Income Payments' averred injury proves even

1    less compelling than those in *Tilton* because the CFPB has not brought an enforcement
2    action against it; absent a stay, Future Income Payments simply must comply with an
3    administrative subpoena.  And, for the reasons articulated already, Future Income
4    Payments is particularly unlikely to defeat enforcement of the CID based on its separation-
5    of-powers challenge because the Executive Branch does not retain exclusive control over
6    the subpoena power.  *See Buckley,* 424 U.S. at 137.  Accordingly, Future Income Payments
7    would not incur substantial prejudice from having to comply with the administrative
8    subpoena.

9         Most importantly, Future Income Payments has not articulated clearly what purpose
10   would be served by granting a stay.  The Ninth Circuit has denied interlocutory review in
11   *CashCall*.  (Ninth Circuit Order, Exh. 4.)  While others may seek interlocutory review on
12   the CFPB's constitutionality, the Court cannot hold this CID in perpetual limbo pending an
13   interlocutory appeal that the Ninth Circuit may never grant.  As for the *en banc*
14   proceedings in *PHH*, any decision by the DC Circuit would be only persuasive authority,
15   and the DC Circuit may very well elect, under the doctrine of constitutional avoidance, not
16   to reach the constitution question pressed by the parties.  The DC Circuit and district court
17   in Future Income Payments' parallel *John Doe Co.* suit have recognized that the
18   company's constitutional challenge should be resolved in this proceeding, or—if the CFPB
19   ultimately elects to take such action—in an enforcement action.  *John Doe Co.*, 849 F.3d at
20   1134; *John Doe Co.*, 2017 WL 663528, at *6.

21        In short, any prejudice Future Income Payments would incur absent a stay and the
22   hypothetical possibility of further appellate guidance do not justify the substantial prejudice
23   that a stay would inflict on this government investigation.  Accordingly, Future Income
24   Payments' Motion to Stay Case is DENIED.

25   **III.    CONCLUSION**

26        The CFPB's Petition to Enforce the Civil Investigative Demand is GRANTED, and
27   Future Income Payments' Motion to Stay Case is DENIED.  Future Income Payments is
28   hereby ORDERED to comply with the CID within fifteen days of this Order or at a later

1    date as may be established by the CFPB or the Court.

2

3

4    DATED:  May 17, 2017

5                                                    HON. JOSEPHINE L. STATON
                                                     UNITED STATES DISTRICT JUDGE
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28